# Exhibit B

Page 49

1    answer back to me?

2                (Record read.)

3        Q.    And the strategic decisions that you're

4    referring to are with respect to severance benefits?

5        A.    The -- each sector's management SLT would

6    determine whether or not their sector was going to

7    extend severance, and typically it was based on groups.

8                For example, AS, AS made a decision in

9    history that everyone in AS would always receive

10   severance benefits.   TS was different in that the senior

11   leadership team would determine their approach for TS,

12   and TS then determined that they would make decisions

13   for severance based upon subunits, which would include a

14   division, an operating unit or even a contract.

15       Q.    To your understanding, is the decision -- is

16   the decision-making process whereby a group of -- when

17   the senior leadership team makes a decision as to

18   whether or not the entire group or some subgroup within

19   the group gets severance, is the process the same, that

20   the decision is made by members of the senior leadership

21   team?

22       A.    Yes.

23       Q.    And is it today -- strike that.

24                I believe previously you identified three

25   sectors, plus two other organizations within the

1    company.  We have AS and MS -- which I forget what that

2    meant -- but we have AS, MS and TS as the three sectors,

3    correct?

4        A.   Correct.

5        Q.   Okay.  And then there's ES and CSO and then

6    the corporate office?

7        A.   Correct.

8        Q.   With respect to AS, is it still the case that

9    the entirety of AS is eligible to receive severance as a

10   sector?

11       A.   Yes.  As long as employees meet, obviously,

12   the eligibility requirement under the plan, but, yes.

13       Q.   And with respect to MS, do you know what the

14   policy or decision was that was made as to MS?

15       A.   It is similar to AS in that all employees will

16   receive severance if laid off if, again, they meet the

17   eligibility requirements under the plan.

18       Q.   And TS, what is the current practice or

19   decision that was made?

20       A.   The current as of today?

21       Q.   As of today.

22       A.   As of today.  TS, as of today, all employees

23   are eligible to receive severance pay or can receive

24   severance pay and benefits, obviously, if they meet the

25   eligibility requirements.

Page 51

 1     Q.   And with respect to AS, it's your

 2  understanding that has been the case since at least

 3  before 2008?

 4     A.   Yes.

 5     Q.   With respect to MS, is that -- how long has

 6  that been -- strike that.

 7              With respect to MS, how long has the

 8  current policy been in place with respect to severance?

 9              MS. ROSS:  I'm going to object to

10  questions that would require information prior to the

11  time period at issue in this lawsuit for discovery,

12  which is 2010.

13              So if you want to rephrase the question.

14              MR. BARTON:  He can give me an answer.

15     A.   I'm sorry, repeat.

16              MR. BARTON:  Can you re-read the

17  question?

18              (Record read.)

19     A.   Well, MS is now a -- it's a sector that was

20  stood up from legacy ES, which is electronic systems,

21  and legacy information systems.  Those two groups came

22  together in January of 2016.  So the overall decision

23  that MS -- everyone in MS receives severance is there

24  now.

25     Q.   And it's been there since 2016, since its

Page 52

1    existence?

2        A.   Since its existence for MS, right.

3        Q.   So it's -- MS was formed as a merger of two

4    prior sectors?

5        A.   Yes.

6        Q.   And that was ES and --

7        A.   ES, and part of the information systems

8    drives.

9        Q.   Do you know -- prior to 2016, do you know what

10   the policy or decision-making was with respect to

11   severance for ES?

12       A.   Yes, that all employees would receive it.

13       Q.   And how long was that policy in place?

14       A.   It predated my time, and I was the ER director

15   supporting ES starting in August of 2013.  And it was in

16   place then, and at least from what I understood, it had

17   been there for as long as anyone could remember.

18       Q.   Okay.  So you believe since before 2008, for

19   example, at least as long going back as -- strike that.

20            The policy existed -- that same policy

21   existed, at least going back to 2008?

22       A.   Yes.

23       Q.   And with respect to IS, do you know what the

24   policy was before it became part of MS?

25       A.   MS would have all employees being eligible for

Page 53

1   severance plans except for certain carve-outs, for

2   example, the postal contract.

3       Q.   I think you referred to MS.  You mean IS?

4       A.   Yes, IS.

5       Q.   Okay.  So IS was all employees if they,

6   otherwise, meet the eligibility requirements, except for

7   certain carve-outs?

8       A.   Correct.

9       Q.   And one carve-out is the postal contract?

10      A.   Correct.

11      Q.   Do you know what the other ones were?

12      A.   For IS, I don't recall any of the -- they were

13  very small contracts, from what I understand, but I

14  don't recall exactly what they were.

15      Q.   I take it the postal contract was a big

16  contract?

17      A.   Yes.

18      Q.   And how long has the TS policy, with respect

19  to severance that exists today, how long has it existed

20  for or been the policy?

21      A.   Let's see, in February of 2014, TS decided to

22  make all -- have all employees be -- could potentially

23  participate in the severance plan.

24      Q.   Does that mean something different than all

25  employees are eligible if they otherwise meet -- all

1    employees are eligible for severance if they meet the

2    eligibility requirements of the plan?

3        A.   It would be the same.

4        Q.   So that policy has existed from February of

5    '14 going forward?

6        A.   Correct.

7        Q.   And in TS, prior to February 2014, do you know

8    what the policy was with respect to severance?

9        A.   Yes.

10       Q.   What was it?

11       A.   Starting in October of 2011, a decision was

12   made that TS, which has very low margins in their

13   business, decided to make available what's called the

14   high plan.  The high plan is where employees could

15   receive one week of severance up to a cap of 26 weeks.

16            That was a change because TS had

17   historically had many different groups come into TS so

18   there were many heritage and legacy approaches to

19   severance.

20            So in October of 2011, the decision was

21   made to give employees all the severance -- I'm sorry,

22   that they would go with the high plan.  The distinction

23   was, they decided -- TS decided that on a division basis

24   each division would decide whether or not that division

25   would be eligible for participation with the severance

1   me.  You're saying, other than what's spelled out in the

2   plan.

3       A.   Right.

4       Q.   What's spelled out in the plan is they have to

5   receive a cover memo, right?

6               MS. ROSS:  Objection, vague.

7       A.   So let me be specific as to the plan document.

8   As soon as an employee is going to get laid off, we

9   provide them a copy of the plan that is -- some sectors

10  will give a letter from the VP saying, "Here's a copy of

11  the plan."

12              Others will reference it somewhere in the

13  body of the document saying, "Oh, by the way, attached

14  is a copy of the plan for your reference."

15              So they would receive that and the

16  severance eligibility letter.

17      Q.   My question is:  In the sectors where a

18  decision has been made to provide severance to all

19  employees, when a particular employee within that sector

20  is -- a decision has been made that that person is going

21  to be terminated, is it automatic that they then get a

22  cover memo signed by the VP or his designee?

23              MS. ROSS:  Objection, vague.

24      A.   I'm not sure what you mean by automatic.

25      Q.   Well, is there a further decision-making that

1    has to be made as to whether a particular employee

2    within that sector is going to get a cover memo?

3         A.    For the sectors that have already made the

4    decision that everyone is getting severance benefits,

5    no.

6         Q.    And the same would also be true with respect

7    to the eligibility letter?

8         A.    Correct.

9         Q.    Earlier you had said that there were certain

10   people within MS that were not -- would not -- were not

11   automatically included or would not receive severance;

12   is that right?

13        A.    Yes, if they were legacy IS, like the postal

14   contract, for example, then, yes, those groups would be.

15   And then obviously within the severance plan, you see

16   other groups that would be excluded by a plan.

17        Q.    And that was going to be my question.  My

18   question is:  The groups that are excluded here on the

19   top of Page 3, that's in addition to certain other

20   groups within IS -- I'm sorry, strike that.

21             The people who are excluded under the

22   terms of the plan on Page 3, that's in addition to

23   certain other groups who are not listed here; is that

24   right?

25        A.    Correct.

1      Q.   With respect to TS where the decision, at

2  least prior to February 2014 -- strike that.  Let me

3  rephrase the question.

4           With respect to TS, prior to February of

5  2014 where eligibility for severance was dependent on

6  each division, operating unit or even program or

7  contract, with respect to providing employees a cover

8  memo or a severance eligibility letter, how was that

9  process made or determined?

10     A.   Are you speaking to the process to where they

11  actually received the documents?

12     Q.   I'm talking about the process in deciding who

13  would receive -- who would receive the cover memo or

14  severance eligibility letter.

15     A.   That's actually two steps.  From 2011 to 2014,

16  the TS sector enacted a -- again, a high plan, but then

17  it would be on a division-by-division subunit, even down

18  to contract level, that that division general manager

19  and the HR person who supports the division, they would

20  take a look at the situation, usually around financials,

21  to then determine whether or not that division, subunit,

22  contract, that they were going to extend layoff --

23  severance benefits to anyone who was laid off.

24           There was actually a form that was

25  implemented that then would be put in place for that

1  division GM, HR person and the sector financial person

2  to capture their decision on whether or not to provide

3  benefits for, again, that division, whatever.

4          So in other words, that new form that was

5  put in from 2011 to 2014 was essentially opting people

6  into paying severance.  So TS as a whole had decided to

7  high plan, but on a case-by-case basis.

8          So each division then had to -- every

9  time a decision was made or an action was taken around a

10  layoff, would -- their division GM would have to

11  generate that -- let's see, it was the severance plan

12  authorization form.

13          And then that would be reviewed and then

14  a determination was made for, however that group was

15  defined, whether or not that group was going to get

16  severance benefits.  That was Step 1.

17          Step 2 is, then based upon that decision,

18  then the HR team would execute -- administer, like I

19  said earlier, the plan to if the employees were getting

20  benefits and also met the eligibility requirements that

21  you see in the plan document, that they would make sure

22  the employee received all the material that we've

23  described before, including the severance eligibility

24  document.

25          If a decision was made not to give that

Page 80

1           But as far as an employee being able to
2   take this and say, "I'm, therefore, eligible based upon
3   what I'm finding here," no.
4       Q.   And there's not a list of objective criteria
5   that an employee can look at and say, "If I meet those,
6   I'll get severance"?
7               MS. ROSS:  Objection, mischaracterizes
8   the document, and vague.
9       A.   I'm sorry, can you repeat it again?  I'm
10  sorry.
11              MR. BARTON:  Read back the question,
12  please.
13              (Record read.)
14      A.   If I meet these conditions that you see on the
15  plan, is that what you're referring to?
16      Q.   Or whatever.
17      A.   I'm not sure what "whatever" means.  Sorry.
18      Q.   Is there a list of criteria that an employee
19  can look at it and say, "If I meet these, I will get
20  severance"?  They will know today if I'm terminated next
21  week that I will get severance?
22      A.   No.
23      Q.   Is that also true for the employees in --
24  strike that.
25              Are there any communications to any of

1          You referred to the term "continued

2     benefits," and what you're referring to is health

3     benefits being provided under the severance plan?

4          A.    Right.   The severance plan has two parts.

5     There's a cash payment and a continuation of the medical

6     benefits, whatever the employee may have had at the time

7     of separation.

8          Q.    And when you're referring to legacy, I know

9     what the term legacy means, but what are you referring

10    to in terms of the legacy plans?

11         A.    Legacy means whatever group you were a part of

12    before you joined a new organization.

13         Q.    These are companies or portions of TS that had

14    been acquired by Northrop Grumann?

15         A.    It was by and large when TS was stood up.   It

16    was by and large the work that was being done across

17    other sectors based on the portfolio we were creating in

18    technical services that they were taking out of those

19    sectors and then moved into TS.

20         Q.    Just so I understand it, most of the people in

21    TS had been in another sector and their group was moved

22    over when the technical services sector was created?

23         A.    Yes, a large portion, at least.

24         Q.    And whether or not they would receive or would

25    be eligible to receive severance depended on what

Page 125

1      A.   Yes.  Those documents in combination is what

2  would trigger HR to know that all the conditions had

3  been met and so, therefore, the payment could be

4  processed.

5      Q.   And then they give instruction to payroll --

6  let me rephrase that.

7             HR, once they receive the documents, then

8  gives an instruction to payroll?

9      A.   Yes.

10     Q.   And so are those documents, those two

11  documents that serve as the trigger, are those

12  maintained somewhere?

13     A.   What time frame are we talking about?

14     Q.   Well, are they maintained today?

15     A.   Currently we have a document management system

16  that went online in 2008, with sectors then

17  progressively coming online up until TS came online in

18  2010.

19             There's never been a requirement, and

20  each group does it differently.  But the separation

21  agreements have never -- have never been required to be

22  put in, for example, the employee's permanent personnel

23  file, even to those instructions used earlier, what if

24  it was in an HR assistant's hard drive and that person

25  left or in a file somewhere that could have got thrown

1    out?

2            So those documents could very well have

3    been lost due to a lack of any other way of capturing

4    them all together.

5        Q.    To your knowledge, there is no way to

6    essentially locate those documents?

7        A.    Correct.  Yeah, they are definitely scattered.

8        Q.    So does the memo itself serve as anything

9    other than a trigger to HR to pay benefits?

10            MS. ROSS:  Objection, vague.

11        A.    A purpose to who?

12        Q.    Does it serve any other purpose other than a

13    trigger to ensure that HR knows to make the instruction?

14        A.    Well, it is to also notify the employee that

15    they are eligible under the severance plan.

16        Q.    Is there any other purpose other than those

17    two?

18        A.    It goes back to what I said earlier.  Some

19    groups have put into that document now that -- saying

20    that the employee has also received a copy of the

21    severance plan document.  But, otherwise, that's the

22    only use.

23        Q.    So there's three uses.  One is to notify

24    employees that they're eligible for severance.  Two,

25    make sure they have a copy of the severance -- the

1  employee has a copy of the severance plan document, and

2  three is to have HR trigger payment; is that correct?

3       A.    Yes, with the last -- the third point also

4  being the separation agreement has to be signed and

5  returned, yes.

6       Q.    Right.  But in terms of the memo, that's the

7  three purposes of the memo?

8       A.    Yes.

9       Q.    Now, with respect to --

10      A.    Could I add to make sure I'm clear on what

11 that means, that last question?

12      Q.    Sure.  If you need to modify, go ahead.

13      A.    Sure.  It effectively makes the employee

14 eligible.  I just want to make sure it was clear that

15 it's not just an administrative way of communicating it

16 and for us -- HR -- to take care of the payment.

17           It is essentially the key document that

18 would effect telling the employee that now -- all of the

19 severance plan description now applies to them, and they

20 are eligible according to what the plan document says.

21      Q.    So when the employee first starts to work for

22 Northrop, do they get a copy of the severance plan?

23           MS. ROSS:  Asked and answered.

24      A.    No.

25      Q.    So is the first time an employee gets a copy

Page 154

1      Q.    We're talking about the severance plan.

2      A.    Right.

3      Q.    Would you consider the sectors other than TS

4    to be harmonized with respect to the severance plan?

5                 MS. ROSS:  Objection, vague.

6      A.    I would say that they are harmonized on how

7    severance pay is concerned.

8      Q.    And are they harmonized with respect to how

9    severance pay is concerned because they use a standard,

10   common practice?

11     A.    I would say that since they are all using

12   now -- or paying the same amount for severance for

13   employees similarly situated, that they would be

14   considered harmonized.

15     Q.    Does the TS sector within its sector pay

16   similarly-situated employees similarly --

17                MS. ROSS:  Objection, vague.

18     Q.    -- pursuant to the -- for severance benefits?

19     A.    I would say if they are similarly situated,

20   based upon the eligibility in the severance plan, yes.

21   There are exclusions.  In DS, for example, they still

22   have part of the postal, so unless there are exclusions

23   like that, that, for example, employees on the same

24   program would receive the same level of severance

25   benefits.

Page 176

1    think it would be handy to have them.

2              MS. ROSS:  I don't agree that his ability

3    to recite the BPC codes to you here are necessary for

4    him to provide the information requested in the

5    deposition notice.  We are not going to take a break.

6    You have not requested those documents.

7              MR. BARTON:  Okay.

8         Q.   Just to make sure I'm clear, you're unable to

9    tell me which BPC codes would indicate that somebody is

10   eligible for health benefits and, therefore, appears

11   included the numbers on the Form 5500; is that right?

12        A.   Correct.

13             MS. ROSS:  Objection, asked and answered.

14        A.   Correct.

15        Q.   Are you able to tell me when a BPC code is

16   assigned?

17        A.   A BPC code is assigned when an employee joins

18   the company.

19        Q.   Is the BPC code ever changed or reassigned?

20        A.   Yes, it can be.

21        Q.   Under what circumstances?

22        A.   Typically if an employee moves from one

23   organization to another, one sector to another, if

24   they're -- if they terminate and then are rehired,

25   typically all BPC codes are changed.

Page 182

1    particular unit within Northrop Grumann; is that

2    correct?

3        A.    Yes.  And, of course, these BPC codes can be

4    used in multiple organizations as well.  So even if it

5    was one division, it could also be used in another

6    division based on which benefit plan the employee was

7    eligible for.  That's the reason there's so many.

8        Q.    So the DAA indicates not only the company --

9    or the organization within Northrop Grumann, but also

10   the benefit plan to which these -- well, strike that.

11   Let's do it this way.

12              The first column is "BPC."  The second

13   column is "Count."

14       A.    Yes.

15       Q.    Does the count indicate the number of

16   employees?

17       A.    It's the number of the count, yes.

18       Q.    Okay.  And the SEV or PJS, it appears that

19   there is one of three choices, either SEV, PJS or none;

20   is that right?

21       A.    Correct.

22       Q.    And what does SEV stand for?

23       A.    SEV means severance.

24       Q.    And that means the person is eligible for

25   severance?

1       A.   That they would be eligible for medical

2   continuation under the severance plan, yes.  And, of

3   course, eligibility also is defined back in the

4   severance plan document but...

5       Q.   And what does PJS mean?

6       A.   PJS is the permanent job -- it is the plan

7   that I referenced earlier, the ES Westinghouse plan, to

8   capture those employees who are eligible for a unique

9   set of benefits that was for them severance for medical

10  benefits continuation.

11      Q.   So everyone with a PJS falls under the

12  Westinghouse plan that you referenced earlier?

13      A.   Correct.

14      Q.   And the "none" means that they are not

15  entitled to any medical -- any -- what did you call it,

16  severance eligible medical continuation; is that right?

17      A.   Well, I wouldn't have that information as far

18  as how it connects if it is for sure for medical

19  continuation.  It definitely says "none" for -- that

20  they would not receive any kind of medical continuation

21  due to a layoff.

22          I'd have to see the more expanded view to

23  see if it also meant -- presumably, it meant that they

24  also did not receive any kind of benefits.

25      Q.   Just so we're clear, the "none" you can

Page 198

1    Service Employees."

2                 Do you see that?

3         A.   Yes.

4         Q.   Did you understand the purpose of this

5    communication?

6         A.   The purpose of the communication was to

7    announce to the TS organization that benefit --

8    severance plan benefits would be available to all

9    eligible employees within the sector.  That was

10   obviously a shift from what had happened between 2011 to

11   2014 where employees -- no one was getting severance

12   unless they opted into the plan.

13                Based upon employee feedback, TS decided

14   to tell everyone the change and how now everyone in TS

15   would be eligible to participate in the plan if they met

16   the eligibility requirements within the severance plan

17   document.

18        Q.   Was there any communication in 2011 about the

19   opt-in program?

20        A.   To whom are you referencing?

21        Q.   I'm sorry, to TS employees.

22        A.   No.

23        Q.   Was there any communication at all to TS

24   employees about how anything with respect to severance

25   would change until the "Missile Minute" in 2013?

1   included as potentially eligible for benefits in the

2   plan's Form 5500 who worked 20 hours or more per week,

3   were not service contract employees or union employees

4   at the time of termination or part of an involuntary

5   layoff or reduction in force and for which the company's

6   database did not reflect that they received an offer of

7   cash severance or a cash severance payment between 2012

8   and 2016.

9              Do you see that?

10      A.   Yes.

11             MS. ROSS:  I'd like him to have the

12  opportunity to read the entire response before you ask

13  him any questions.

14             MR. BARTON:  That's fine.

15             MS. ROSS:  Why don't you start by reading

16  the entire response?

17             (Pause in proceedings.)

18      A.   Okay.

19      Q.   Did you participate in the assembly of the

20  data that is part of the response to Interrogatory

21  Number 16?

22      A.   Interrogatory Number 16 on Exhibit 24, right?

23      Q.   Correct.

24      A.   No, I did not.

25      Q.   Do you have any understanding in terms of the

1    reasons why there are 751 people identified as

2    participants in the Form 5500 who did not receive cash

3    severance pay?

4         A.   We defined participants under Form 5500 as

5    those who are potentially -- who could potentially

6    participate in the severance plan.  As I understand the

7    information at the top of the page, this was those

8    employees who had a layoff code but did not receive any

9    cash severance.

10        Q.   Do you know if this includes people who, for

11   example, didn't return a separation agreement?

12        A.   So this could be lots of different points.  It

13   could be, correct, somebody who did not return a

14   separation agreement, right.  It --

15        Q.   Other than -- I'm sorry, go ahead.

16        A.   It could have been somebody who was laid off

17   and then rehired fairly quickly, so they have a -- they

18   would have had a code that showed a layoff at one point

19   and they'd come back.  I've had those happen with

20   employees too.  Those would be the primary reasons that

21   it would have been.

22        Q.   And for a sector like aerospace systems, would

23   there be any other reasons?

24        A.   For aerospace, it would typically be -- we've

25   had employees who just didn't return back the separation