IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALAN CARLSON & PETER DELUCA<br><br>Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION and the NORTHROP GRUMMAN SEVERANCE PLAN,<br><br>Defendants. | Case No. 13-cv-2635<br><br>District Court Judge Andrea R. Wood |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON STANDARD OF REVIEW

Plaintiffs Alan Carlson and Peter DeLuca ("Plaintiffs"), two former employees of a subsidiary of Northrop Grumman Corporation, allege that they were improperly denied severance benefits under the Northrop Grumman Severance Plan in violation of the Employee Retirement Income Security Act of 1974. Because the governing plan documents provide the plan administrators full discretionary authority to, *inter alia*, decide whether individuals qualify as plan participants, construe and interpret the terms of the plan, and decide whether participants satisfy the plan's eligibility requirements, their decision to deny Plaintiffs' claims is entitled to the highest level of deference and may only be overturned to the extent it was arbitrary and capricious.[1]

---

[1] At the July 11, 2016 hearing after the Court issued its opinion and order denying Defendants' motion to dismiss, the Court invited the parties to submit a motion for partial summary judgment on the standard of review in advance of the regular dispositive motion schedule. Accordingly, the instant motion addresses only this issue. Defendants reserve their right to move for summary judgment on the merits at a later date.

I.    **STATEMENT OF FACTS**

   A.    **Plan Structure**

Northrop sponsors a number of employee benefit plans designed to provide Northrop's employees various retirement, health, and welfare benefits. Prior to 2012, these plans included two separate severance benefit plans: (1) The Northrop Grumman Electronic Systems Sector Employee Security & Protection Plan (the "ES&PP Plan"); and (2) The Northrop Grumman Severance Plan. (Statement of Facts ("SUF") ¶ 1.) The respective terms of these two plans were set forth in separate "summary plan documents" that served as both the official plan documents and summary plan descriptions. (*Id.* at ¶ 2.) However, in 2012, Northrop decided to consolidate the two separate severance plans into a single plan by creating a "wrap" plan document that incorporated the two plans as separate "component plans" or benefit "programs." (*Id.* at ¶ 3.) This consolidated severance plan, which was formally adopted on December 15, 2011 and has been in effect since January 1, 2012, is referred to as the Northrop Grumman Severance Plan, ERISA Plan Number 673 ("the Plan"). (*Id.*) It is this Plan which governs Plaintiffs' claims here.[2]

The terms of the Plan are set forth in the "wrap" plan document ("the Wrap Plan") and two separate "component" plan documents.[3] (*Id.* at ¶¶ 3-6, 11.) The Wrap Plan contains general information related to the purpose of the Plan, identifies the Plan's participants, delegates and describes plan administrative responsibilities, and establishes the procedure by which the Plan may be terminated or amended. (*Id.* at ¶ 5.) It does not, however, set forth "the specific

---

[2] Plaintiffs' employment with Northrop was terminated in 2012 as part of a reduction-in-force. (Dkt. #62, Am. Cmpl. ¶¶ 3, 12.)
[3] The Component Plan document also incorporates an appendix containing specific information regarding the cash portion of the severance benefits plaintiffs are entitled to receive. This appendix, however, is not relevant for purposes of this motion and has not been included as an exhibit.

severance benefits provided under the Plan." (*Id.*) These terms are described in the separate component plan documents, which the Wrap Plan incorporates by reference. (*Id.*; Declaration of Jim Kemp, Exhibit A, Wrap Plan Document, at NGC00338, NGC00341 ("Accordingly, all of the terms and provisions of each of the Component Plans . . . are incorporated herein by reference[.]").) These component plan documents were amended and restated in 2012 to reflect the new plan structure. (SUF ¶ 4; *see also infra* note 8 (describing component plan amendments).) Of the two separate component plans identified by the Wrap Plan, only the "Northrop Grumman Severance Plan" component ("the Component Plan") is at issue in this case.

### B. Plan Administration

The terms of the Plan related to its administration and the plan administrator's authority are primarily set forth in the Wrap Plan, which designates Northrop's Chief Human Resources and Administrative Officer as the "Plan Administrator." (SUF ¶ 6.) Under the Plan, the Plan Administrator is responsible for performing all necessary administrative duties except for reviewing appeals challenging the Plan Administrator's denial of claims for plan benefits. (*Id.* at ¶ 7.) That responsibility is vested in the Northrop Grumman Corporate Severance Plan Review Committee (referred to in the Wrap Plan as the "Administrative Committee"), which is comprised of three members appointed by either the Plan Administrator or Northrop's Chief Executive Officer. (*Id.*)

The Wrap Plan further provides that when carrying out their respective duties, the Plan Administrator and the Administrative Committee have "the full discretionary power to administer the Plan in all of its details" and that "[a]ll interpretations, findings, and decisions of the Plan Administrator and Administrative Committee, as applicable, shall be final and

3

conclusive." (*Id.* at ¶ 8.) In particular, the Wrap Plan provides that the Plan Administrator and the Administrative Committee have "full discretionary authority" to, *inter alia*:

> (b) Determine eligibility of Employees to participate in the Plan.
>
> (f) Construe and interpret the terms of the Plan, including the power to remedy possible ambiguities, inconsistencies or omissions.
>
> (g) Determine the amount of benefits and eligibility for benefits.
>
> (n) Decide all questions concerning the Plan, including making findings of fact.

(*Id.* at ¶ 9.) The Plan Administrator's and the Administrative Committee's broad grant of discretionary authority is similarly described in the Component Plan, which provides that the Plan Administrator is "vested with all power and authority necessary or appropriate to administer the Plan on behalf of [Northrop]." (*Id.* at ¶ 10.) The Component Plan also provides that "[t]he Plan Administrator, the administrator, and Corporate Severance Plan Review Committee shall have sole absolute discretion over claims and appeals issue and determinations regardless of the timing of such determination or exercise of such discretion." (*Id.*)

### C. The Claims Procedure

Under the Plan, if an employee believes he is entitled to severance benefits, he must submit a formal claim for benefits to the Plan Administrator. The procedures for submitting and deciding claims for plan benefits are set forth in the Component Plan document, which, in accordance with ERISA, establishes a two-tiered claims procedure. (*Id.* at ¶ 11; 29 C.F.R. § 2560.503-1(h) ("Every employee benefit plan shall establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan[.]").) First, within 90 days of being terminated, an employee or his authorized representatives must file a written claim with the Plan Administrator that sets forth the reasons why he believes he is entitled to benefits. (*Id.* at ¶ 12.) If the claim is

denied, the employee will receive a letter from the Plan Administrator explaining the reasons for the denial. (*Id.*) The employee then has 60 days to file an appeal with the Administrative Committee. (*Id.*) If the employee chooses to appeal, the Administrative Committee will meet, consider all materials submitted by the claimant in connection with his appeal, and render a decision in writing. (*Id*.) This decision is final and can only be challenged by filing suit in federal court.

### D.     Plaintiffs' Administrative Claims

On August 3, 2012, Northrop terminated Plaintiffs' employment as part of a reduction-in-force of employees in their program within Northrop's Technical Services Sector. (*Id.* at ¶ 13.) On August 20, 2017 and August 27, 2017, respectively, plaintiffs Carlson and DeLuca submitted their claims for severance benefits to the Plan Administrator. (*Id.* at ¶ 14.)  In both letters, Plaintiffs contended that the decision by their management not to provide severance in connection with the reduction-in-force to which they were subject was improper because severance had been offered in connection with prior lay-offs. (*Id.*)

Plaintiffs' claims were reviewed by Margaret Collins, Corporate Director for Retirement Administration, Compliance and Services, on behalf of the Plan Administrator. (*Id.* at ¶ 15.) On November 9, 2012, Collins responded to Plaintiffs and explained that as stated in the Component Plan, a laid-off employee is only eligible for severance benefits if he receives a memorandum from the Vice-President of Human Resources (or his or her designee) designating the employee as eligible. (*Id*.)  Collins contacted both Carlson's and DeLuca's managers and confirmed that neither had received an eligibility memorandum. (*Id.*) Accordingly, Collins informed Plaintiffs that their claims were denied. (*Id*.)

5

DeLuca and Carlson subsequently appealed the denial of their claims to the Administrative Committee on December 2, 2012 and January 3, 2013, respectively. (*Id*. at ¶ 16.) Both argued on appeal that the denial of severance was improper because the Plan did not set forth a uniform standard or policy for determining which employees would receive a severance eligibility memorandum. (*Id.*) Thus, according to Plaintiffs, their managers' refusal to provide them an eligibility memorandum was arbitrary and capricious and violated ERISA. (*Id.*)

On January 31, 2013, the Administrative Committee met to discuss and decide Plaintiffs' appeals. (*Id.* at ¶. 17.) At this meeting, the Administrative Committee reviewed the appeals letters and exhibits submitted by Plaintiffs, as well as a memorandum prepared by Collins that summarized Plaintiffs' claims, explained the reasons for her initial claim denial, and recommended that the Administrative Committee deny Plaintiffs' appeals. (*Id*. at ¶¶ 16-17.) Collins' memorandum noted that the Plan "<u>does not</u> require that the Company establish a policy, whether written or unwritten, with regard to the determination of whether a terminated employee will receive a memorandum and thus be eligible for benefits under the Plan." (*Id.*; Collins Decl., <u>Exhibit H</u>, Appeals Memorandums, NGC00097, NGC00290.) Collins explained the Plan was designed so that the company, through its Vice-President of Human Resources (or that individual's designee), had discretion to award severance on a "case by case basis."[4] (*Id.*) The Administrative Committee concluded that it was permissible under ERISA for it to apply the terms of the Plan requiring a severance memorandum and that the company had the discretion to determine which employees would receive a memorandum. (*Id.* at ¶ 19.) Furthermore, the Administrative Committee determined that enforcing the Plan's memorandum requirement

---

[4] Collins pointed out, for example, that the company and its managers could determine whether severance was appropriate "based on the particular circumstances surrounding the individual's termination of employment" or on "more broadly based, contract driven factors." (Collins Decl., <u>Exhibit H</u>, at NGC00097.)

6

would not violate ERISA.  (*Id.*)  Accordingly, the Administrative Committee voted unanimously to deny Plaintiffs' appeals.  (*Id.*)  Plaintiffs subsequently filed this suit.

## II.     ARGUMENT

Ever since the Supreme Court's decision in *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989), it has been axiomatic that where an employee benefit plan provides its plan administrators and fiduciaries discretionary authority to interpret plan terms and decide participants' claims, those interpretations and decisions are entitled to deference and can only be overturned if arbitrary and capricious.  As the Supreme Court has often pointed out, this deferential approach is grounded in sound public policy: by allowing plan administrators to interpret their own plans, courts ensure that disputes are resolved efficiently, predictably, and uniformly, thereby incentivizing employers to create benefit plans in the first place.  *See Conkright v. Frommert*, 559 U.S. 506, 517 (2010) ("Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'") (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1987)).  Here, the terms of the Plan as set forth in both the Wrap Plan and Component Plan clearly and expressly provide the Administrative Committee unqualified discretionary authority to decide claims and interpret the Plan to the fullest extent possible under ERISA.  Accordingly, the Administrative Committee's  interpretation of the Plan and its denial of Plaintiffs' claims is entitled to the highest level of deference and should be reviewed under the arbitrary and capricious standard.[5]

---

[5] In the context of a claim under 29 U.S.C. § 1132(a)(1)(B), the court reviews the final, post-appeal decision rendered by the plan administrator or fiduciary tasked with deciding appeals because "[t]o focus elsewhere would be inconsistent with ERISA's exhaustion requirement." *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, --- U.S. ---, 136 S.Ct. 651 (2016).

7

A. <u>**The Arbitrary and Capricious Standard Applies**</u>

The Seventh Circuit has explained that the applicable standard of review for district courts in deciding claims under 29 U.S.C. § 1132(a)(1)(B) turns on the language of the plan documents.[6] *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 448 (7th Cir. 2009) ("A central question in this appeal is whether this court should review Cigna's decision de novo, as Raybourne argues, or as Cigna argues, for abuse of discretion. The answer hinges on the language of the plan documents."). Where the plan documents provide a plan administrator discretion to interpret plan terms and decide claims for benefits, those interpretations and decisions are reviewed under the "arbitrary and capricious" standard. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860-61 (7th Cir. 2009); *Wetzler v. Illinois CPA Soc. & Foundation Retirement Income Plan*, 586 F.3d 1053, 1057 (7th Cir. 2009). Here, the language of the governing plan documents—the January 2012 restatement of the Wrap Plan and the January 2012 restatement of the Component Plan—leaves no doubt that in adopting the Plan, Northrop wanted to ensure that the Plan Administrator and the Administrative Committee had unfettered discretion when it came to carrying out their respective administrative responsibilities.[7]

The broad authority and significant discretion afforded to the Plan Administrator and the Administrative Committee is described in detail in the Wrap Plan. In particular, Section 4.08 of the Wrap Plan expressly provides that "[t]he Plan Administrator and Administrative Committee, in the exercise of their responsibilities, shall have ***the full discretionary power*** to administer the

---

[6] In cases where a plan has been periodically amended and restated, the iteration that controls whether the administrator had discretion, and therefore must be afforded deference, is the one in effect at the time the benefits were denied. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003).

[7] The unfettered discretion of management to decide who receives a severance memorandum is not at issue in this brief and does not fall within the scope of the Court's review in a case under 29 U.S.C. § 1132(a)(1)(B). Nonetheless, the Seventh Circuit has been very clear that it does not violate ERISA for a plan to provide company management absolute discretion to determine which employees are eligible to participate in an employee benefit plan. *McNab v. General Motors Corporation*, 162 F.3d 959 (7th Cir. 1998).

Plan in all of its details[.]" (SUF ¶ 8; Kemp. Decl., Exhibit A, at NGC00346-47) (emphasis added). That discretionary power, which is constrained only by the ERISA's mandates and other applicable laws, specifically includes, but is not limited to, the power to determine which employees meet the eligibility requirements to participate in the Plan, construe and interpret the terms of the Plan, determine eligibility for benefits, and decide all questions concerning the Plan's operation. (Kemp Decl., Exhibit A, at NGC00347-49.) The Plan also provides that when exercising those broad powers, "[a]ll interpretations, findings, and decisions of the Plan Administrator and Administrative Committee, as applicable, shall be final and conclusive." (*Id.* at NGC00347.) Leaving no doubt as to the Plan Administrator's discretion, the Wrap Plan additionally provides that "[t]he Plan Administrator is expressly empowered with the full and final discretion to determine all of the following: (a) Whether and to what extent Employees are eligible to become Participants under the Plan; [and] (b) The amount and types of benefits Participants will receive under the Plan." (*Id.* at NGC00345.)

The Wrap Plan's discretionary language is echoed by the summary description of that authority in the Component Plan. In the section of the Component Plan describing the claims procedure, it states that "[t]he Plan Administrator, the administrator, and Corporate Severance Plan Review Committee shall have ***sole absolute discretion*** over claims and appeals issue[s] and determinations regardless of the timing of such determinations or exercise of such discretion." (SUF ¶ 10, Kemp Decl., Exhibit C, at NGC00334) (emphasis added). The Component Plan further states that "[t]he administrator is vested with all power and authority necessary or appropriate to administer the Plan on behalf of the Plan Administrator, and he has ***full discretionary authority*** in this capacity." (*Id.*) (emphasis added).

9

Given the above language, which vests the Plan Administrator and the Administrative Committee with complete discretionary authority to carry out their respective duties, the Administrative Committee's interpretation of the Plan and its decision to deny Plaintiffs' claims must be afforded the "highest level of deference," which requires the Court to apply the "arbitrary and capricious" standard. *Exbom v. Central State, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir. 1990) ("Courts facing a decision by a trustee vested with th[e] highest level of discretion should review the trustee's decision under a standard embodying the highest level of deference. That standard is the arbitrary and capricious standard."). "Although it is an overstatement to say that a decision is not arbitrary and capricious whenever a court can review the reason stated for the decision without a loud guffaw, it is not much of an overstatement." *Russo v. Health, Welfare & Pension Fund, Local 705, Intern. Broth. Of Teamsters*, 984 F.2d 762, 766 (7th Cir. 1993) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). As will be further shown in later briefing on summary judgment, the Plan Administrator's and the Administrative Committee's interpretation of the Plan as requiring an eligibility memorandum before awarding benefits is directly in line with the Plan's verbatim language. (*See* SUF ¶ 15 n.2.)

Furthermore, courts have recognized that the deference afforded to a plan administrator under the arbitrary and capricious standard extends not only to the ultimate decision to deny benefits, but also to the underlying plan interpretations that support that decision. *See Conkright*, 559 U.S. at 517 ("*Firestone* deference . . . permit[s] an employer to grant primary interpretative authority over an ERISA plan to the plan administrator, [thereby] preserv[ing] the 'careful balancing' upon which ERISA is based."); *Wetzler*, 586 F.3d at 1057 ("[A]n administrator's interpretation is given great deference and will not be disturbed if it is based on a reasonable

10

interpretation of the plan's language."). Thus, the Court must defer to the Administrative Committee's interpretation of the Plan as requiring employees to receive a severance memorandum before becoming eligible for benefits, and providing Northrop's management, through its Vice-President of Human Resources, the discretion to issue these memorandums on a case-by-case basis.

### B. Plaintiffs' Attempt to Avoid the Arbitrary and Capricious Standard Fails

In an effort to avoid the arbitrary and capricious standard, Plaintiffs have erroneously argued that in deciding their appeals, the Administrative Committee did not possess the broad discretionary authority set forth in the Wrap Plan, but instead was limited to the discretionary language in the Component Plan, which Plaintiffs contend is more narrow. (Dkt. #109 at 2-3.) Plaintiffs are wrong. Their efforts to avoid the Wrap Plan's application are premised on both a tortured interpretation of the Component Plan's language as well as a fundamental misunderstanding of the Plan's structure. Moreover, even in the absence of the Wrap Plan, the arbitrary and capricious standard of review would still govern because the language of the Component Plan is clear in granting the Administrative Committee the discretion to decide eligibility for benefits.

#### 1. The Wrap Plan Governed Plaintiffs' Claims

The use of a "wrap plan" and a "component plan" as was used here is not a novel or atypical arrangement. Indeed, courts have explicitly recognized their coordinated existence as governing plan documents. *See, e.g., Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007) (applying wrap plan's discretionary

language and explaining that a wrap plan "provides the governing structure of the overall [program] and describes the general procedures for determining participation, funding, administration, and claims under each individual welfare program to be established by the employer"); *Werb v. Reliastar Life Ins. Co.*, No. 13-cv-0669, 2014 WL 2881468, at *6 (D. Minn. June 25, 2014) ("Effective January 1, 2010, Goodrich rolled its various ERISA welfare-benefit plans . . . into an overarching master plan that the parties refer to as the 'wrap plan.' . . . The wrap plan grants discretionary authority to the plan administrator to interpret the plan and determine eligibility for benefits."). Plaintiffs' suggestion that all of a plan's terms must be set forth in a single document, and that therefore the Component Plan must have superseded and discharged the Wrap Plan, is contrary to controlling Seventh Circuit law. *See Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 712 (7th Cir. 1999) ("[O]ften the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as 'the plan.'").

Ignoring the overall structure of the Plan and the Wrap Plan's explicit language incorporating the Component Plans,[8] Plaintiffs obliviously argue that the Component Plan is an entirely separate, "integrated" instrument that superseded and "discharge[d]" the terms of the Wrap Plan. (Dkt. #109 at 2.) As support for this contention, Plaintiffs point to the Component Plan's statement that "[t]his summary plan description also constitutes the official 'Plan' document governing benefits; there are no other Plan documents that govern [participants'] benefits," as well as its statement that participants may "obtain copies of the combined Plan document and summary plan description . . . upon written request to the Plan Administrator." (*Id.* at 3).

---

[8] The Wrap Plan provides as follows: "The Plan provides severance benefits under one or more benefit structures referred to and defined herein as 'Component Plans.' . . . The specific severance benefits provided under the Plan are described in the Component Plans. Accordingly, all of the terms and provisions of each of the Component Plans, as the same may be modified from time to time as provided for in each of the Component Plans, are incorporated herein by reference[.]" (Kemp Decl., Exhibit A, NGC00341.)

While cherry-picking select statements in the Component Plan, Plaintiffs noticeably ignore the terms of the Plan that clearly demonstrate it is comprised of more than one document. For instance, the Component Plan document expressly states in its "Plan Identification" section that "[t]he Plan is considered a component plan under a plan also named the Northrop Grumman Severance Plan, ERISA plan number 673." (Kemp Decl., Exhibit C, at NGC00335). The Component Plan document further explains that "[t]his document serves **as part** of the official Plan document and is the summary plan description for the Plan." (*Id.*) (emphasis added). These provisions, which were incorporated into the Component Plan only after the Wrap Plan was created, are flat-out inconsistent with Plaintiffs' contention that the Component Plan document is a "fully-integrated" instrument that supersedes the terms of the Wrap Plan.[9] Try as they might, Plaintiffs cannot ignore the obvious connection between the Wrap Plan and the Component Plan. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (holding that under the rules of contract construction applicable to ERISA plans, "a [plan] document should be read as a whole with all its parts given effect, and related documents must be read together").

Further undermining Plaintiffs' argument is the fact that the Component Plan's statement "there are no other Plan documents that govern [participants'] benefits" is entirely accurate. In setting forth the Plan's general administrative terms, the Wrap Plan explains that "[t]he specific severance benefits provided under the Plan are described in the Component Plans." (SUF ¶ 5). Similarly, the Component Plan's statement that "the combined Plan document and summary plan description" may be obtained from the Plan Administrator is not inconsistent with the existence

---

[9] Prior to 2012, the Component Plan provided: "This document serves both as the official Plan document and the summary plan description." (Kemp Decl. 2010 Component Plan, Exhibit B, at NGC00238.) However, after the adoption of the Wrap Plan in January 2012, the Component Plan was amended to state: "This document serves as **part of** the official Plan document and is the summary plan description for the Plan." (Kemp Decl., 2012 Component Plan, Exhibit C, at NGC00335) (emphasis added).

13

of the Wrap Plan. This statement simply identifies the Component Plan as one—but not necessarily the only—plan document available from the Plan Administrator.

### 2. The Component Plan Alone Necessitates the Arbitrary and Capricious Standard of Review

Plaintiffs' attempt to argue around the Wrap Plan does them no good because the discretionary authority in the Component Plan alone mandates the arbitrary and capricious standard of review. As the Seventh Circuit has instructed on more than one occasion, there are no "magic words" that must be used to effectively confer discretion on a plan administrator, nor is it necessary to describe a plan administrator's discretionary authority in exhaustive detail. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000). Instead, all that is required is that the plan put participants on notice that it reserves discretion for the administrator.[10] *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 637 (7th Cir. 2005). The Component Plan's language, which is similar in brevity and functionally equivalent to the "safe harbor" language commended by the Seventh Circuit, accomplishes this goal. *See, e.g. Herzberger*, 205 F.3d at 331 ("We . . . commend to employers the following 'safe harbor' language for inclusion in ERISA plans: 'Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.'"). Plaintiffs cannot escape the notable similarity between the Component Plan's language and the Seventh Circuit's suggested safe harbor language. Thus, whether applying the language of the Wrap Plan or the Component Plan, this Court may only overturn the Administrative Committee's decision upon a finding that it was arbitrary and capricious.

## III. CONCLUSION

---

[10] Notably, Plaintiffs have never pled, notwithstanding two complaints, that they were somehow misled by the discretionary authority described in the Component Plan. Nor would that have any legal relevance to the standard of review for this Court.

In enacting ERISA, Congress sought to encourage employers to offer retirement and welfare benefits by providing assurances that their benefit plans would not be construed by the courts in unpredictable ways that might impose unanticipated liabilities. In furtherance of this goal, the Supreme Court has consistently recognized employers' right to grant their plan administrators discretion to promulgate definitive interpretations of their plans and to decide participants' claims for benefits thereunder. *Conkright*, 559 U.S. at 517. The paramount importance of this right is front-and-center in cases such as this one—where individual plaintiffs ask a court to bind an employer to a tortured interpretation of a plan that is directly contrary to the employer's intentions. This Court should foster the strong public policy noted by courts far-and-wide that it is Plan Administrators, not the courts, that are best suited to interpret their benefit plans, and should review the determinations here under the deferential arbitrary and capricious standard.

Date: January 4, 2017

Respectfully submitted,

/s/ *Nancy G. Ross*
Nancy G. Ross (6190243)
NRoss@mayerbrown.com
Laura Hammargren (6310920)
LHammargren@mayerbrown.com
Abigail M. Bartine (No. 6312317)
abartine@mayerbrown.com
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone:    312.782.0600
Facsimile:    312.701.7711

*Attorneys for Northrop Grumman Corporation and Northrop Grumman Severance Plan*

**CERTIFICATE OF SERVICE**

    The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served upon all parties of record via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois on January 4, 2017.

                                                   /s/ Nancy G. Ross
                                                   Nancy G. Ross