# Exhibit CC

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
3 ALAN CARLSON & PETER   §
  DeLUCA, individually   §
4 and on behalf of a     §
  class of similarly    §
5 situated individuals,  §
     Plaintiffs,     §
6                 §
  VS             §     Civil Action No. 13-cv-2635
7                 §
  NORTHROP GRUMMAN     §
8 CORPORATION and the   §
  NORTHROP GRUMMAN     §
9 SEVERANCE PLAN,      §
     Defendants.     §
10
11
12   --------------------------------------------------------
    ORAL DEPOSITION OF NORTHROP GRUMMAN CORPORATION
13
                  SERVICE PLAN
14
  BY AND THROUGH ITS DESIGNATED 30(B)(6) REPRESENTATIVE
15
             MICHAEL LEE PENKERT
16
            DECEMBER 16, 2016
17   --------------------------------------------------------
18
19         ORAL DEPOSITION OF NORTHROP GRUMMAN
20 CORPORATION SERVICE PLAN BY AND THROUGH ITS DESIGNATED
21 30(B)(6) REPRESENTATIVE MICHAEL LEE PENKERT, produced as
22 a witness at the instance of the PLAINTIFFS, and duly
23 sworn, was taken in the above-styled and numbered cause
24 on the 16th day of December, 2016, from 9:25 a.m. to
25 5:52 p.m., before TINA TERRELL BURNEY, CSR in and for

Page 7

1              (Exhibits 1 - 2 marked.)

2                   MICHAEL LEE PENKERT,

3    having been first duly sworn, testified as follows:

4                        EXAMINATION

5    BY MR. BARTON:

6         Q.   Good morning.

7         A.   Morning.

8         Q.   Would you state your full name, please?

9         A.   Michael Lee Penkert.

10        Q.   And what is your address?

11        A.   728 Joanna Drive, Hurst, Texas 76053.

12        Q.   Have you ever been deposed before?

13        A.   Yes.

14        Q.   How many times?

15        A.   Once.

16        Q.   Was that on behalf of Northrop Grumann?

17        A.   No.

18        Q.   How long ago was it?

19        A.   Roughly, 20 years ago.

20        Q.   All right.  Let me go through in terms of what

21   will happen here today so we're both clear.  So I will

22   ask you a series of questions today, and I'll expect you

23   to give answers.  The court reporter has sworn you in.

24   Do you understand that?

25        A.   Yes.

```
                                              Page 11
  1    request, and we agreed to that.
  2                MS. ROSS:  Thank you.
  3                MR. BARTON:  And my understanding is the
  4    witness today was going to be prepared to testify as to
  5    Topics 1 through 6.
  6                MS. ROSS:  Thank you.
  7         Q.   What is your current position today?
  8         A.   I'm corporate director for employee relations.
  9         Q.   Your employer is Northrop Grumann?
 10         A.   Yes.
 11         Q.   How long have you been employed with Northrop
 12    Grumann?
 13         A.   14 years.
 14         Q.   Have you held the same position?
 15         A.   No.
 16         Q.   How long have you had the position of
 17    corporate director of employee relations?
 18         A.   Two years.
 19         Q.   And what position did you hold before that?
 20         A.   I was an employee relations director.
 21         Q.   Explain to me what the difference is.
 22         A.   The employee relations director before was
 23    appointed to and supported specific sectors.  My role
 24    now is I lead the entire team, which includes all
 25    sectors.
```

```
                                                    Page 17

 1         A.    Yes.

 2         Q.    Are they also divided by sectors?

 3         A.    Yes.

 4         Q.    Can you give me the names of those people and

 5    the sectors they are responsible for?

 6         A.    Sure.   Francine Lane, L-a-n-e, AS.   Sandra

 7    Barreda, that's B-a-r-r-e-d-a, TS and ES and CSO.

 8         Q.    Sandra has responsibility for TS, ES and CSO?

 9         A.    It's ES and CSO, right.   So that one

10    organization, yes.   That's one organization.

11         Q.    Okay.

12         A.    Deidre Keane.

13         Q.    Keane?

14         A.    K-e-a-n-e, mission systems, MS.   Kim Brown,

15    she oversees our operations group.   And Patsy Wolf, she

16    takes care of our dispute resolution and Equal

17    Employment Opportunity agency claims.

18         Q.    Is Wolf with an E or without an E?

19         A.    Without an E.

20         Q.    Is it correct that Northrop is now divided

21    into three sectors?

22         A.    Yes.

23         Q.    And what are those three sectors?

24         A.    Aerospace systems, AS; mission systems, MS;

25    technology services, TS.   And then we also have -- those
```

1    are the sectors, and then we also have ES and CSO, which

2    is a support organization, supports all sectors in the

3    corporate office.

4        Q.   Prior to the time that you became corporate

5    director of employee relations, was there somebody else

6    who was filling that role of responsibility?

7        A.   Yes.

8        Q.   Who was that?

9        A.   Louise Ussery.

10       Q.   Spell her name, too.

11       A.   U-s-s-e-r-y.

12       Q.   And do you know how long she was in that

13   position?

14       A.   For about a year and a half.  We stood up the

15   ER team in August of 2013, and then she left right at

16   January of 2015.

17       Q.   Let's go back through your employment history.

18   Prior to Northrop, prior to August of 2013, what was

19   your title at Northrop Grumann?

20       A.   I was a senior HR manager.

21       Q.   Who did you report to?

22       A.   Constance Soloway.

23       Q.   Can you spell her last name?

24       A.   S-o-l-o-w-a-y.

25       Q.   How long were you a senior HR manager?

Page 22

1      Q.   And so when did the center of excellence --
2  when was the center of excellence created or organized?
3      A.   August of 2013 is when it started.
4      Q.   Is there a head of the group?
5      A.   Yes, me.
6      Q.   And you have been the head of the group since
7  August of 2013?
8      A.   No.
9      Q.   Okay.  How long have you been the head of the
10  group?
11      A.   January of 2015.
12      Q.   And was the head of the group -- I'm sorry,
13  was the head of the center of excellence your
14  predecessor?
15      A.   Yes.
16      Q.   In your role today, do you have
17  responsibilities with respect to or for the Northrop
18  Grumman severance plan?
19               MS. ROSS:  Objection, vague.
20      Q.   She may object from time to time.  Unless she
21  gives you an instruction to answer, you should go ahead
22  and answer my question.
23               MS. ROSS:  You mean unless I give him an
24  instruction not to answer.
25               MR. BARTON:  Correct.

```
                                                    Page 23
 1            THE WITNESS:  Oh, okay.
 2      A.    We do not control the severance plan.
 3      Q.    When you say "we," who is "we"?
 4      A.    The employee relations center of excellence.
 5      Q.    Do you have any responsibilities with respect
 6   to the severance plan in your current role today?
 7      A.    My team will help administer the severance
 8   plan.  For today we take care of the new MS sector, ES,
 9   CSO and the corporate office.
10            MR. BARTON:  Can I have that read back?
11            (Record read.)
12      Q.    I think you said you help administer; is that
13   right?
14      A.    We do administer the plan.
15      Q.    Just for those sectors?
16      A.    Correct.
17      Q.    And do you have an understanding of who
18   administers the plan at Northrop Grumman other than for
19   those sectors or groups?
20            MS. ROSS:  Objection, vague.
21      A.    That takes care of the day-to-day
22   administration of the plan, yes.
23            MR. BARTON:  I'm sorry, can you read that
24   back?  And why don't you read my question back, too?
25            (Record read.)
```

```
                                                    Page 38
 1                  MS. ROSS:  Joe, we'd like to take a break
 2      whenever it's a convenient time for you.
 3                  MR. BARTON:  Sure.  Give me a few
 4      minutes.
 5                  MS. ROSS:  Okay.
 6          Q.   So if you were to look at the current
 7      employees in the database today, is there a way to --
 8      strike that.
 9                  If you were to look at the current
10      employees in the database today, would there be certain
11      employees who are not eligible or not participants in
12      the severance plan?
13                  MS. ROSS:  Objection, vague.
14          A.   Well, there -- when you say -- could you
15      repeat it?  I'm sorry.
16          Q.   Sure.  If you were to look at the database,
17      the HR database today as to current employees, is there
18      an identifier in the database that tells you whether or
19      not that person is either a participant in the severance
20      plan or is potentially eligible for severance benefits?
21          A.   So when you say participant, are you -- is the
22      participant per the Form 5500 in your mind or the
23      participant as under the severance plan?
24          Q.   Let me start it this way.  In the HR database,
25      is there a code that identifies someone as being a
```

1  participant in the severance plan?

2      A.   The BPC code would show that person as being a

3  participant as defined under the 5500.

4      Q.   Okay.  And is there -- would that same code

5  indicate whether or not someone is potentially eligible

6  for benefits, or is there a separate code --

7                MS. ROSS:  Objection, vague.

8      Q.   -- or a separate identifier?

9      A.   Could you repeat that, please?

10               MR. BARTON:  Can you read it back for

11 him?

12               (Record read.)

13     A.   The BPC code, as it connects to the 5500,

14 shows that participants are potentially -- can

15 potentially participate in the severance plan.  The

16 trigger to actually giving an employee -- covering an

17 employee for the severance plan, which would include the

18 medical benefits, would be the separation code.

19     Q.   So when we're referring to the code that

20 identifies someone as a participant for purposes of the

21 Form 5500, is there a name for that code?

22     A.   Well, it's the BPC.

23     Q.   So the BPC code indicates whether or not

24 someone is listed as a participant for purposes of the

25 Form 5500?

1      A.   Yes.

2      Q.   Is the BPC identifier dependent on which

3   sector of employment someone is in?

4      A.   The BPC codes are connected to the benefit

5   program, and then each sector then would be able to say

6   by sector -- even sometimes by contract -- which BPC

7   code would be connected to that organization, and then

8   by extension, to that employee.

9      Q.   Is there a list of BPC codes?

10      A.   Yes.

11      Q.   How many are there?

12      A.   I don't know the exact number.

13      Q.   Give me a ballpark.

14      A.   I'd say probably several dozen.

15      Q.   Is there some sort of guide as to what each of

16   the codes mean?

17      A.   Yes.

18      Q.   Something you have access to?

19      A.   I'm sure if I asked for it, I could get it.

20      Q.   Do you know who maintains it?

21      A.   The benefits group.

22      Q.   Do you know who in the benefits group?

23      A.   I believe it's Kathleen Sholinsky who does

24   that now.

25      Q.   Can you spell her name?

Page 42

1    director, again, administration was based on what

2    documents we were creating to give to the employees

3    during a reduction in force, and so I had

4    responsibilities for that since, roughly, 2002 until

5    2008 as my main job as HR director.

6         Q.   Just so I understand, the responsibilities

7    that you had between 2008 -- strike that.

8              Between 2002 and 2008, what were the

9    responsibilities you had with respect to the severance

10   plan?

11        A.   It was administration, as I defined earlier,

12   as far as the severance eligibility letters, reduction

13   in force notices to employees, the packages that,

14   essentially, would go to employees.

15             My team would also be the ones who would

16   help decide -- help the management decide on what

17   reduction in force actions we were taking.  But then

18   after the decision was made, then my team would come

19   through and essentially take the severance plan document

20   and then execute according to the severance plan.

21        Q.   What does that mean, to "execute according to

22   the severance plan"?

23        A.   That means we would make sure that we gave

24   everyone a severance eligibility letter, everyone

25   received a reduction in force notice, a separation

Page 43

1    agreement.  We would also check to make sure that they

2    were eligible by the plan, for example, they worked at

3    least 20 hours a week, that they remain in the job

4    before then, that they signed the separation agreement

5    when they came back.

6              So, essentially, it was taking care of

7    all of those documents and processes for the employee.

8         Q.   And other than those three things, did you

9    have any other decision-making responsibilities between

10   2000 and 2008 as to whether or not someone would receive

11   severance?

12        A.   No.  The group I was in at the time, the

13   decision was made that everyone would receive severance.

14        Q.   And what was that group?

15        A.   That was -- well, at the time it was called

16   internal information systems group, which is, through

17   many, many evolutions, is now the ES and CSO

18   organization.

19        Q.   Between 2008 and 2013, did you have any role

20   in making any decisions in terms of whether someone

21   qualified for severance under the plan?

22        A.   Yes.

23        Q.   And what was that role?

24        A.   Well, I would check to make sure did they

25   work -- have they been with us for at least 20 hours

1     Q.   So I'm talking about the time period of 2008

2  to 2013.

3     A.   Right.

4     Q.   And in that time period, you were responsible

5  for ES and CSO and the corporate office, correct?

6     A.   Yes, right.

7     Q.   And the decision had already been made prior

8  to you coming in that role that everyone in those groups

9  would receive severance in the event they met the other

10  criteria, correct?

11     A.   Correct.

12     Q.   So if they had worked more than 20 hours a

13  week, and they signed the severance document, everyone

14  within those groups would receive severance if they were

15  terminated; is that right?

16     A.   Yes.

17     Q.   And that decision had been made, to your

18  understanding, well before 2008?

19     A.   Correct.

20     Q.   And that decision still applied for all of

21  those employees throughout the five years that you were

22  in that position?

23     A.   Correct, and existing even today.

24     Q.   And you're not aware in terms of who had made

25  that decision prior to 2008?

1          MS. ROSS:  Objection.  It's beyond the

2    scope of the 30(b)(6).

3          MR. BARTON:  Well, I disagree.

4    A.    I don't know -- I wouldn't know who the

5    individuals are who made the actual decision.

6    Q.    Do you have an understanding in terms of at

7    what level that decision is made?

8    A.    Yes.

9    Q.    What level?

10   A.    It typically would be at the senior leadership

11   team for that sector.

12   Q.    What does the senior leadership team mean?

13   A.    Typically comprised of the sector president,

14   sector chief financial officer, the vice president of HR

15   who supported that sector.  Usually it's also the direct

16   reports to the president of the team -- president of

17   that sector.

18   Q.    You said the direct reports to the president

19   of that sector?

20   A.    Yes.  They typically sit on like a senior

21   leadership team for each of the sectors.

22   Q.    So are the direct reports of the president of

23   that sector, is that a separate group of people than the

24   three titles you have already given me?

25   A.    Yes.

1   Q.   Who are those by title?

2   A.   Well, each sector is significantly different.

3   Q.   Okay.

4   A.   But typically it would be like division

5   general managers or vice presidents, for example, vice

6   president of engineering, vice president of operations,

7   so essentially the vice presidents who had

8   responsibility for major organizations that report to

9   that president.

10   Q.   And to your understanding, what you have

11   described, even though the particular people may differ,

12   is the process the same throughout the company?

13         MS. ROSS:  Objection, vague.

14   A.   It varies by each sector, but in general,

15   there is an executive group who sits on top of the

16   sector who makes strategic decisions.

17   Q.   And the strategic decision that you're

18   referring to is whether or not a particular group within

19   the company will receive severance and whether all or

20   some group of people within those groups will receive

21   severance?

22         MS. ROSS:  Objection, compound.

23   Q.   Let me break it out.

24   A.   Thank you.

25         MR. BARTON:  Will you read his last

Page 49

1    answer back to me?

2                (Record read.)

3        Q.    And the strategic decisions that you're

4    referring to are with respect to severance benefits?

5        A.    The -- each sector's management SLT would

6    determine whether or not their sector was going to

7    extend severance, and typically it was based on groups.

8                For example, AS, AS made a decision in

9    history that everyone in AS would always receive

10   severance benefits.  TS was different in that the senior

11   leadership team would determine their approach for TS,

12   and TS then determined that they would make decisions

13   for severance based upon subunits, which would include a

14   division, an operating unit or even a contract.

15       Q.    To your understanding, is the decision -- is

16   the decision-making process whereby a group of -- when

17   the senior leadership team makes a decision as to

18   whether or not the entire group or some subgroup within

19   the group gets severance, is the process the same, that

20   the decision is made by members of the senior leadership

21   team?

22       A.    Yes.

23       Q.    And is it today -- strike that.

24                I believe previously you identified three

25   sectors, plus two other organizations within the

Page 50

1    company.  We have AS and MS -- which I forget what that

2    meant -- but we have AS, MS and TS as the three sectors,

3    correct?

4          A.   Correct.

5          Q.   Okay.  And then there's ES and CSO and then

6    the corporate office?

7          A.   Correct.

8          Q.   With respect to AS, is it still the case that

9    the entirety of AS is eligible to receive severance as a

10   sector?

11         A.   Yes.  As long as employees meet, obviously,

12   the eligibility requirement under the plan, but, yes.

13         Q.   And with respect to MS, do you know what the

14   policy or decision was that was made as to MS?

15         A.   It is similar to AS in that all employees will

16   receive severance if laid off if, again, they meet the

17   eligibility requirements under the plan.

18         Q.   And TS, what is the current practice or

19   decision that was made?

20         A.   The current as of today?

21         Q.   As of today.

22         A.   As of today.  TS, as of today, all employees

23   are eligible to receive severance pay or can receive

24   severance pay and benefits, obviously, if they meet the

25   eligibility requirements.

Page 51

1      Q.   And with respect to AS, it's your

2   understanding that has been the case since at least

3   before 2008?

4      A.   Yes.

5      Q.   With respect to MS, is that -- how long has

6   that been -- strike that.

7                With respect to MS, how long has the

8   current policy been in place with respect to severance?

9                MS. ROSS:  I'm going to object to

10  questions that would require information prior to the

11  time period at issue in this lawsuit for discovery,

12  which is 2010.

13               So if you want to rephrase the question.

14               MR. BARTON:  He can give me an answer.

15     A.   I'm sorry, repeat.

16               MR. BARTON:  Can you re-read the

17  question?

18               (Record read.)

19     A.   Well, MS is now a -- it's a sector that was

20  stood up from legacy ES, which is electronic systems,

21  and legacy information systems.  Those two groups came

22  together in January of 2016.  So the overall decision

23  that MS -- everyone in MS receives severance is there

24  now.

25     Q.   And it's been there since 2016, since its

Page 52

1   existence?

2       A.   Since its existence for MS, right.

3       Q.   So it's -- MS was formed as a merger of two

4   prior sectors?

5       A.   Yes.

6       Q.   And that was ES and --

7       A.   ES, and part of the information systems

8   drives.

9       Q.   Do you know -- prior to 2016, do you know what

10  the policy or decision-making was with respect to

11  severance for ES?

12      A.   Yes, that all employees would receive it.

13      Q.   And how long was that policy in place?

14      A.   It predated my time, and I was the ER director

15  supporting ES starting in August of 2013.  And it was in

16  place then, and at least from what I understood, it had

17  been there for as long as anyone could remember.

18      Q.   Okay.  So you believe since before 2008, for

19  example, at least as long going back as -- strike that.

20           The policy existed -- that same policy

21  existed, at least going back to 2008?

22      A.   Yes.

23      Q.   And with respect to IS, do you know what the

24  policy was before it became part of MS?

25      A.   MS would have all employees being eligible for

1    severance plans except for certain carve-outs, for

2    example, the postal contract.

3         Q.   I think you referred to MS.  You mean IS?

4         A.   Yes, IS.

5         Q.   Okay.  So IS was all employees if they,

6    otherwise, meet the eligibility requirements, except for

7    certain carve-outs?

8         A.   Correct.

9         Q.   And one carve-out is the postal contract?

10        A.   Correct.

11        Q.   Do you know what the other ones were?

12        A.   For IS, I don't recall any of the -- they were

13   very small contracts, from what I understand, but I

14   don't recall exactly what they were.

15        Q.   I take it the postal contract was a big

16   contract?

17        A.   Yes.

18        Q.   And how long has the TS policy, with respect

19   to severance that exists today, how long has it existed

20   for or been the policy?

21        A.   Let's see, in February of 2014, TS decided to

22   make all -- have all employees be -- could potentially

23   participate in the severance plan.

24        Q.   Does that mean something different than all

25   employees are eligible if they otherwise meet -- all

Page 54

1    employees are eligible for severance if they meet the

2    eligibility requirements of the plan?

3         A.    It would be the same.

4         Q.    So that policy has existed from February of

5    '14 going forward?

6         A.    Correct.

7         Q.    And in TS, prior to February 2014, do you know

8    what the policy was with respect to severance?

9         A.    Yes.

10        Q.    What was it?

11        A.    Starting in October of 2011, a decision was

12   made that TS, which has very low margins in their

13   business, decided to make available what's called the

14   high plan.  The high plan is where employees could

15   receive one week of severance up to a cap of 26 weeks.

16             That was a change because TS had

17   historically had many different groups come into TS so

18   there were many heritage and legacy approaches to

19   severance.

20             So in October of 2011, the decision was

21   made to give employees all the severance -- I'm sorry,

22   that they would go with the high plan.  The distinction

23   was, they decided -- TS decided that on a division basis

24   each division would decide whether or not that division

25   would be eligible for participation with the severance

Page 55

1   plan.

2            But what I mean by severance plan is they

3   would receive the cash benefit and the continuation of

4   medical benefits.

5        Q.   So between October 2011 and February of 2014,

6   the decision in TS was made on a division-by-division

7   basis?

8        A.   Yes, and even to continue the subsets.  As we

9   talked about earlier about subsets, a subset could also

10  be not only a division, but it could be an operating

11  unit, which is typically a subdivision that is made up

12  of several and many different contracts, perhaps, or one

13  major contract and maybe several different ones.

14           So the decision would then reside not

15  only within the division, but could also then go to the

16  operating unit level or even down to a particular

17  contract.

18       Q.   With respect to the level of benefits that

19  were available to employees at TS, understanding that

20  the eligibility may be decided further down, but in

21  terms of the level of benefits, how does the high plan

22  differ from what was in place or what was adopted with

23  respect to AS or MS?

24           MS. ROSS:  Time frame, please.

25           MR. BARTON:  Between 2011 and 2014.

Page 58

1       Q.    January 1st of 2017?

2       A.    Correct, 2017.

3       Q.    How long has AS had the high plan?

4       A.    As long as I can remember.

5       Q.    And for TS, going from February 2014 forward,

6    they have had the low plan; is that right?

7       A.    Yes, and will continue the low plan into

8    January 1st, 2017.

9       Q.    So as of January 1st, 2017, all employees in

10   all sectors will be on the high plan; is that correct?

11      A.    No.

12      Q.    Will employees in AS, MS and TS all be on the

13   high plan as of January 1st, 2007?

14      A.    No.  All employees on AS, MS will be on the

15   high plan.  TS will be on the low plan.

16      Q.    Even as of January 1st?

17      A.    Correct.

18      Q.    Prior to October of 2011, what was the policy

19   with respect to severance for TS?

20              MS. ROSS:  Objection, vague.

21      A.    When you say the policy for severance, what

22   are you talking about?

23      Q.    Well, in terms of -- first of all, in terms of

24   eligibility, were all employees eligible, or was it

25   based on a decision -- based on a division or operating

Page 59

1    unit or contract basis?

2         A.    The severance plan document has always

3    determined the eligibility for the severance plan.  The

4    decision that was being made locally within each sector

5    was around the severance pay schedule.

6              Those have always been historically left

7    to each sector to make a determination on who they would

8    pay and how much they would pay for severance pay.

9    Eligibility has always been at the severance plan only.

10        Q.    When you're referring to eligibility, what do

11   you mean?  You used the term, "All employees if they

12   meet the eligibility requirements," what are the

13   eligibility requirements?

14        A.    The eligibility requirements that are spelled

15   out in the severance plan document.

16        Q.    And what, in your mind, are those?

17        A.    Let me make sure I don't miss one, but it is

18   you have to work at least 20 hours; that you have to

19   receive a -- you can receive the severance plan

20   document, but it pertains to you only if you receive it

21   under letter by a VP of HR or their designee; that you

22   receive a severance eligibility letter.

23        Q.    I'm sorry, the severance eligibility letter is

24   different than the second requirement?

25        A.    Yes.

```
                                                    Page 60

 1        Q.    What is that?

 2        A.    Which, I'm sorry?

 3        Q.    I'll tell you what, let's spell out the

 4    eligibility requirements, and then we'll go back.

 5                    So we have 20 hours?

 6        A.    Right.

 7        Q.    And the second one was?

 8        A.    That you receive the severance plan document

 9    under a cover letter by the HR VP or designee.  You've

10    received a severance eligibility letter that you've

11    signed a separation agreement and general release.

12                    There's one more.  I'm drawing a blank.

13    I would have to look at the document.

14        Q.    I'll help you out.

15        A.    Thank you.

16        Q.    Does it matter if you have the one from 2012

17    or 2010?

18        A.    No.  They are the same as far as eligibility.

19                    (Exhibit 3 marked.)

20        Q.    All right.  I've handed you what's been marked

21    as Exhibit Number 3.  Do you recognize this?

22                    MR. BARTON:  For the record, it bears

23    Bates Stamp NGC6970 through 6980.

24        Q.    For your reference, sir, there's little

25    numbers down at the bottom.  I'm not sure if you're
```

```
                                                Page 61
 1    familiar with them, but lawyers number documents, and we

 2    put a unique identifier on every single page that gets

 3    produced in the litigation.  So when I'm referring to a

 4    Bates number, that's what it refers to.

 5         A.   Okay.

 6         Q.   Do you recognize Exhibit Number 3?

 7         A.   Yes.

 8         Q.   Tell me what it is.

 9         A.   It is the November severance plan.

10              MS. ROSS:  I'm going to object on the

11    grounds that this is not a complete copy of the

12    severance plan.

13              MR. BARTON:  Okay.

14              MS. ROSS:  It's not --

15              MR. BARTON:  Nancy, it's not proper for

16    you to be having conversations with this witness in the

17    middle of my testimony.

18              MS. ROSS:  I'll put it on the record.

19    The --

20              MR. BARTON:  That's also not proper.  I

21    ask questions.  He answers questions.  You object or you

22    instruct him not to answer.  That's the proper way we

23    conduct examinations here.  You suggesting answers to

24    this witness is not proper.

25              MS. ROSS:  I'm not going to allow a
```

1    it to them then, which would include the severance

2    eligibility, the -- well, the documents that are

3    referenced in the severance plan document.

4              Some organizations do it a little bit

5    differently where the employee receives a notification

6    letter, usually from their manager.  And then following

7    usually within a day or so, either the manager or HR

8    representative would then provide them the other

9    documents you see in the severance plan.

10        Q.   In both instances, is it provided only after a

11   person has been identified that they are about to be

12   terminated?

13        A.   Well, obviously the written notification

14   letter is the one that really starts the process, so

15   they receive, typically, that first, then followed

16   either immediately or very quickly or very soon with the

17   separation agreement and the severance eligibility

18   letter.

19        Q.   Right.  But in both instances, are people --

20   has a decision already been made that this person's

21   employment is going to be terminated?

22        A.   Before they receive these documents?

23        Q.   Correct.

24        A.   Yes, yes.

25        Q.   So the cover letter from the vice president is

Page 66

1    not being sent to employees, say, at the beginning of

2    their employment or prior --

3        A.   Correct.

4        Q.   And never prior to a time that they have been

5    identified as someone who is going to be terminated?

6        A.   Correct.

7                 MS. ROSS:  I think we should identify for

8    the record, Joe, that the original copy of the exhibit

9    that you've handed the witness has highlighting on it,

10   just so there is no confusion.

11                MR. BARTON:  That's fine.  That was

12   probably a copying mistake.

13                Why don't we take a break?

14                (Recess.)

15                (Exhibit 3 re-marked.)

16       Q.   All right.  I've handed you a newly marked

17   Exhibit Number 3, which should contain no highlighting.

18       A.   Yes.

19       Q.   So now it looks like the document that you're

20   familiar with with no highlighting, right?

21       A.   Yes.

22       Q.   In referencing the cover memo signed by a vice

23   president of human resources or his designee, is that

24   what you're referencing if you look at Page 3 of the

25   document and any eligible employees?

Page 67

1      A.    Yes.

2      Q.    And then the letter, what you referred to as

3   the severance eligibility letter, is that what you're

4   referring to in the first bullet point under "Conditions

5   of Receiving Benefits"?

6      A.    Yes.

7      Q.    And with respect to both, both of them are

8   provided to an employee around the time that the person

9   has already been designated or targeted for termination

10  of employment; is that correct?

11     A.    They would receive those documents after they

12  have been told they are being laid off.

13     Q.    And earlier when you were referring to certain

14  sectors where all employees would receive severance if

15  they, otherwise, meet the eligibility requirements,

16  which of these eligibility requirements were you

17  referring to with respect to that?

18     A.    It would be all the ones I mentioned earlier

19  and what are shown in the plan documents under "Eligible

20  Employees."  And to our conversation here, the first

21  three bullets under "Conditions For Receiving Benefits."

22     Q.    And when someone had made on a sector-wide

23  basis a determination that all employees would receive

24  severance if they meet the eligibility requirements, was

25  there also a determination that all of those employees

Page 69

1    me.  You're saying, other than what's spelled out in the

2    plan.

3         A.   Right.

4         Q.   What's spelled out in the plan is they have to

5    receive a cover memo, right?

6              MS. ROSS:  Objection, vague.

7         A.   So let me be specific as to the plan document.

8    As soon as an employee is going to get laid off, we

9    provide them a copy of the plan that is -- some sectors

10   will give a letter from the VP saying, "Here's a copy of

11   the plan."

12             Others will reference it somewhere in the

13   body of the document saying, "Oh, by the way, attached

14   is a copy of the plan for your reference."

15             So they would receive that and the

16   severance eligibility letter.

17        Q.   My question is:  In the sectors where a

18   decision has been made to provide severance to all

19   employees, when a particular employee within that sector

20   is -- a decision has been made that that person is going

21   to be terminated, is it automatic that they then get a

22   cover memo signed by the VP or his designee?

23             MS. ROSS:  Objection, vague.

24        A.   I'm not sure what you mean by automatic.

25        Q.   Well, is there a further decision-making that

1    has to be made as to whether a particular employee

2    within that sector is going to get a cover memo?

3        A.   For the sectors that have already made the

4    decision that everyone is getting severance benefits,

5    no.

6        Q.   And the same would also be true with respect

7    to the eligibility letter?

8        A.   Correct.

9        Q.   Earlier you had said that there were certain

10   people within MS that were not -- would not -- were not

11   automatically included or would not receive severance;

12   is that right?

13       A.   Yes, if they were legacy IS, like the postal

14   contract, for example, then, yes, those groups would be.

15   And then obviously within the severance plan, you see

16   other groups that would be excluded by a plan.

17       Q.   And that was going to be my question.  My

18   question is:  The groups that are excluded here on the

19   top of Page 3, that's in addition to certain other

20   groups within IS -- I'm sorry, strike that.

21            The people who are excluded under the

22   terms of the plan on Page 3, that's in addition to

23   certain other groups who are not listed here; is that

24   right?

25       A.   Correct.

Page 75

1           The new approach to severance was

2    announced in 2011.  It could have been made as early as

3    that, or it could have been made closer to whenever they

4    have determined that a certain group was going to be

5    affected through a layoff.

6        Q.   So some -- you're telling me some divisions

7    within TS may have made a decision as of, say, October

8    2011, "All employees in our division are going to get

9    severance"?

10       A.   They could have, then opted in, filling out

11   the forms so it is being reviewed.  I do know that

12   certain divisions had decided that they were going to

13   not pay anyone, but they still had the opportunity to

14   later on, if they wanted to opt them in, they could.

15       Q.   Do you know which divisions made which

16   decisions?

17       A.   I do not.

18       Q.   Do you know who would know that?

19       A.   It would probably be the HR VP or business

20   leaders for each of those groups.

21       Q.   And if you wanted to find that information

22   out, where would you go?

23       A.   I'd have to look in our company database to

24   determine who the HR people were at the time for those

25   groups.

Page 77

1     Q.   Are you aware of any that paid severance

2  during that time period within TS?

3     A.   Yes.  I do recall seeing that certain groups

4  have opted in, so that leads me to an estimation or

5  guess that that would then have led to them receiving

6  severance pay.

7     Q.   Just so I understand, you're aware that

8  certain groups had opted in, but you don't know today

9  which ones did?

10     A.   No.  I can't recall the details.

11     Q.   How would an employee know whether or not they

12  would be eligible for severance prior to the time that

13  they received notification that they were going to be

14  laid off or terminated?

15     A.   Well, the severance plan document has always

16  been available on our benefits website.  It doesn't

17  include information as far as how severance pay is

18  handled, but the document has always existed on the

19  website.  So a quick search on our benefits website, an

20  employee could have found it.

21     Q.   And what you're referring to is on the website

22  is Exhibit Number 3?

23     A.   Yes, or a --

24     Q.   A prior version?

25     A.   Correct.  As far as the employee then, when

1    they became aware of what severance or benefits they

2    received through the layoff, it goes back to that

3    severance eligibility letter telling them, "Here's a

4    copy of it," and usually an HR person explaining, at

5    least in general, what the benefits were and what to

6    expect.

7        Q.   But in looking at this document, this document

8    doesn't tell someone whether or not they will be

9    eligible for severance if and when they are ever

10   terminated, correct?

11              MS. ROSS:  Objection, vague.

12              Why don't you define what "this document"

13   is for the record?

14              MR. BARTON:  Sure.

15       Q.   Exhibit Number 3 -- strike that.

16              Does Exhibit Number 3 inform a particular

17   employee as to whether or not he is eligible to receive

18   severance if and when he's ever terminated?

19       A.   No.  It gives you -- it gives the employee a

20   view of what could happen potentially, but then

21   obviously it would take them receiving the document that

22   would then -- for example, the severance eligibility

23   document and the written notification document, it would

24   then point them to that now that this is enacted for

25   you.

1          But as far as an employee being able to

2     take this and say, "I'm, therefore, eligible based upon

3     what I'm finding here," no.

4          Q.   And there's not a list of objective criteria

5     that an employee can look at and say, "If I meet those,

6     I'll get severance"?

7               MS. ROSS:  Objection, mischaracterizes

8     the document, and vague.

9          A.   I'm sorry, can you repeat it again?  I'm

10    sorry.

11              MR. BARTON:  Read back the question,

12    please.

13              (Record read.)

14         A.   If I meet these conditions that you see on the

15    plan, is that what you're referring to?

16         Q.   Or whatever.

17         A.   I'm not sure what "whatever" means.  Sorry.

18         Q.   Is there a list of criteria that an employee

19    can look at it and say, "If I meet these, I will get

20    severance"?  They will know today if I'm terminated next

21    week that I will get severance?

22         A.   No.

23         Q.   Is that also true for the employees in --

24    strike that.

25              Are there any communications to any of

1    the employees, for example, in AS or MS sectors, as to

2    whether or not they will receive severance in the future

3    if they are laid off?

4         A.   In AS and MS, no, there's no guarantee that

5    they would receive severance if they were laid off, a

6    communication to that effect.

7         Q.   And I'm not saying a guarantee, but is there a

8    list of criteria that tells a person, "Here's the right

9    criteria we're looking for.  If you meet these three

10   things or five things, you will receive severance"?

11              MS. ROSS:  Objection.  Are you talking in

12   addition to the plan?  This is very vague.  He's already

13   testified it's in the plan.

14              MR. BARTON:  You can object as to vague,

15   and that's a proper objection for you to make, but

16   speaking objections are not proper.

17              MS. ROSS:  Well, I feel -- asked and

18   answered.

19              MR. BARTON:  Fine.

20              Please read the question back.

21              (Record read.)

22        A.   If we're talking about communications that

23   have been made to the employee population in whole in AS

24   or MS, no.

25        Q.   Prior to October 2011, what was the policy

1      A.   Well, the policy, as it refers to severance

2   pay, was -- it was many different plans, is the best way

3   I can describe it.  There was a mixture of high and low

4   plans.  There was some groups who had by contract not

5   been eligible for severance up to that point.

6               So it was multiple different plans, if

7   you will, that then in 2011 there was the opportunity to

8   get them all on the same page and move forward.  So

9   there are many details.  It depends on your legacy as

10  well.

11     Q.   So when you're referring to many different

12  plans, prior to October of 2011, there was a single

13  severance plan at Northrop, correct?

14     A.   If we are talking about Exhibit 3, the

15  severance plan document, that has always existed, again,

16  just as long as I can remember since being with the

17  company.

18     Q.   So there was a single plan prior to 2011 at

19  the time -- strike that.

20               So when you're referring to multiple

21  plans, what are you referring to?

22     A.   To be clear, the multiple plans I'm speaking

23  about is -- the multiple plans would be on how to,

24  essentially, administer severance pay.  It could also

25  very well be whether or not your contract was eligible

Page 84

1    to participate in the severance plan.

2                    So those -- when I say plan before 2011,

3    is what I'm saying was not in any way referring to the

4    severance plan document in Exhibit 3.

5        Q.   So how was it determined as to whether or not

6    a particular group of individuals in technical services

7    was eligible for severance?

8        A.   What time frame, sir?

9        Q.   Prior to 2011.

10       A.   It would have been the HR team understanding

11   what legacy plan the employee was under before they were

12   brought together into TS, and then to administer it

13   based upon whatever legacy plan they were on.

14                   And when I say plan, again, I'm talking

15   about severance pay and if they -- the benefits

16   continuation, if they -- if their legacy had allowed

17   them into being eligible for severance.

18       Q.   And when you're referring to severance pay,

19   you're referring to the cash portion of severance?

20       A.   Correct.

21       Q.   And you referred to something else as health

22   benefits.  That's the health benefits under the

23   severance plan?

24       A.   Correct.

25       Q.   Continuing on with -- I'm sorry, strike that.

Page 85

1          You referred to the term "continued
2    benefits," and what you're referring to is health
3    benefits being provided under the severance plan?
4          A.   Right.   The severance plan has two parts.
5    There's a cash payment and a continuation of the medical
6    benefits, whatever the employee may have had at the time
7    of separation.
8          Q.   And when you're referring to legacy, I know
9    what the term legacy means, but what are you referring
10   to in terms of the legacy plans?
11         A.   Legacy means whatever group you were a part of
12   before you joined a new organization.
13         Q.   These are companies or portions of TS that had
14   been acquired by Northrop Grumann?
15         A.   It was by and large when TS was stood up.   It
16   was by and large the work that was being done across
17   other sectors based on the portfolio we were creating in
18   technical services that they were taking out of those
19   sectors and then moved into TS.
20         Q.   Just so I understand it, most of the people in
21   TS had been in another sector and their group was moved
22   over when the technical services sector was created?
23         A.   Yes, a large portion, at least.
24         Q.   And whether or not they would receive or would
25   be eligible to receive severance depended on what

1  their -- what the group or the prior sector had done

2  with respect to severance; is that right?

3      A.   Up until 2011 when the decision was made,

4  right.  But prior to 2011, October of 2011, yes.

5      Q.   And you testified that there were two parts --

6  I think you referred to two parts -- but it's two sets

7  of benefits under the severance plan, right, a cash

8  portion and continued health benefits, right?

9      A.   Yes.  As I read it here on Exhibit 3 on Page

10  4, it says it, "consists of two parts, a cash payment

11  and an extension of your existing medical, dental and

12  vision coverage."

13      Q.   Do they have the same eligibility

14  requirements?

15      A.   Eligibility within the severance plan

16  document, Exhibit 3, yes.

17      Q.   Do they have the same condition for benefits?

18      A.   Both of those elements of cash and...

19      Q.   Yes.

20      A.   Yes, they do.

21      Q.   Tell me what you did to prepare to testify

22  today.

23      A.   I met, obviously, with counsel who is present,

24  discussed history with employees who I understood would

25  have had knowledge of how this worked in each of the

Page 93

1   to 2011, it was how much -- if an employee was eligible

2   and they were going to get severance, how much they

3   would get paid for severance.

4       Q.   When you are saying how much they would get

5   paid, there would be people -- in certain groups or

6   divisions within TS, there would be people who would be

7   paid zero severance pay, right?

8       A.   Prior to 2011?

9       Q.   Correct.

10      A.   That is highly probable.

11      Q.   So there would be people -- prior to 2011,

12  there would be certain groups of people within TS who

13  would not be eligible to receive any severance benefits;

14  is that right?

15           MS. ROSS:  We're saying prior to 2011.

16  Can you be more specific?

17           MR. BARTON:  Prior to October of 2011.

18      A.   Oh, okay.  Can you repeat it, please?

19      Q.   Yes.  Prior to October of 2011, is it correct

20  that there would have been certain people or certain

21  groups of people within TS who would not have been

22  eligible to receive any severance benefits?

23      A.   Correct, because their division or their

24  contract, the management had decided that division or

25  contract wouldn't receive severance benefits, correct.

1     Q.   And is that documented somewhere in terms of

2   what groups or divisions of people would not have been

3   eligible to receive any severance plans?

4     A.   I have not seen any documents to that.

5     Q.   Is there any way that you know to determine

6   that?

7     A.   Determine if the documents are available?

8     Q.   Determine which groups of people prior to

9   October of 2011 would have been eligible to receive

10   severance or not eligible to receive severance.

11     A.   No.  I'm not aware of -- I'm not aware of how

12   that would be reflected.

13     Q.   Would that be reflected in a BPC identifier in

14   the HR database?

15     A.   It could.  The BPC codes have been around for

16   several years, so there would be a BPC code attributed

17   to each employee; however, BPC codes, we're talking

18   specifically about medical benefits continuation for

19   severance, not cash pay.

20     Q.   Is there any code within the -- strike that.

21          Just so I understand, the BPC code in the

22   HR database only indicates whether or not you are

23   entitled health benefits under the severance plan?

24     A.   The BPC code specifies which medical, dental,

25   vision plan the employee would be eligible for.  Then by

Page 98

1    Q.   And this may be a disconnect, so I may be

2    having a disconnect.  But is there two separate codes in

3    the HR database, a BPC code and a separation code?

4    A.   Yes.  Those are two separate codes.

5    Q.   And the BPC code, that indicates -- explain to

6    me, what does that indicate?

7    A.   That indicates which benefit program the

8    employee is eligible for.

9    Q.   When you're saying benefit program, are you

10   talking about health benefits?

11   A.   Sure, yes, health, dental, vision, those, yes.

12   Q.   If you want to group them as health/welfare

13   benefits -- or let's call them health benefits, and I'll

14   understand you mean dental and the others designated.

15   A.   Okay.

16   Q.   Okay.  So the BPC code indicates which health

17   benefit program you're in?

18   A.   Right.

19   Q.   What set of health benefits you get; is that

20   correct?

21   A.   Correct, yes.  Or, conversely, if benefits

22   weren't being extended.  We did have certain groups of

23   employees who weren't extended benefits historically as

24   well.

25   Q.   You're talking about health benefits?

1     A.    Health benefits.

2     Q.    And the BPC code exists in the HR database

3 both for purposes of knowing which benefits, health

4 benefits, current employees get, as well as

5 understanding whether someone is going to receive

6 continued health benefits?

7     A.    Yes.

8     Q.    Okay.  And what --

9     A.    But it's only triggered to actually receive

10 the benefits by the employees who have been laid off.

11 The actual trigger to them getting that is which code do

12 we use in the HR database.  The separation code would

13 then tell you whether or not they were to receive it.

14     Q.    Okay.  And the separation code -- so the

15 separation code is supposed to tell Hewitt whether or

16 not an employee who has been terminated should receive

17 continued health benefits?

18     A.    Correct.  And by default, what we found in

19 2011 was a disconnect in that Hewitt -- that code that

20 we gave to Hewitt was, again, anybody who had been laid

21 off has been receiving medical benefits, health

22 benefits, after separation.

23           In 2013 the company established a new

24 code, and that new code would then give us the

25 opportunity to turn off benefits if we so chose.

Page 100

1     Q.    You established a new code in 2013?

2     A.    Yes.

3     Q.    And you discovered that there was continued

4     health benefits being provided to all terminated

5     employees in 2011?

6     A.    Correct.

7     Q.    So it took two years to create a new code and

8     turn that off?

9     A.    If we wanted to.  So that code is put in place

10    and available now, but to date, the company has not used

11    that new separation code.

12    Q.    So to date, it still provides continued health

13    benefits to all terminated employees?

14    A.    If they use the code that has always

15    historically been used, yes.  The new code that was put

16    in place in 2013, honestly, the HR community is probably

17    not even aware of that.

18    Q.    I just want to understand.

19    A.    Sure.

20    Q.    Tell me if I'm wrong.  So in 2011, Northrop

21    Grumann or the plan discovers that the separation code

22    that is being used -- that is in the HR database is

23    being transmitted to Hewitt, and as a result of that,

24    Hewitt is continuing to pay health -- continued health

25    benefits for essentially all terminated employees; is

Page 101

1    that right?

2        A.   For all employees who have been laid off.

3        Q.   Who have been laid off.

4        A.   Yes.

5        Q.   And in 2013, Northrop developed a new code

6    where the company can choose, if they use that, to not

7    continue to pay health benefits for persons who have

8    been laid off?

9        A.   Correct.

10       Q.   But through today, it still continues to pay

11   health benefits to employees -- to essentially all

12   employees who have been laid off; is that right?

13       A.   That is right.  That is how the system works.

14   It wasn't the intent of the severance plan, but that is

15   how the plan has been -- or how the benefit system has

16   worked.

17       Q.   And when you say it's not the intent of the

18   plan, how do you know that?

19       A.   By the severance plan in Exhibit 3, it says --

20   it goes back to the conditions to receive benefits, you

21   must receive essentially the severance eligibility

22   letter saying that you are -- notifying you you are

23   eligible for this benefit.

24            And then over on Page 4, it talks of

25   benefits under the plan consists of two parts, cash

1    then essentially -- they would create an appendix that

2    would then say if it was a high or a low plan connecting

3    back to what we discussed earlier.

4        Q.   But on the overall plan, the way the plan

5    works is that not everyone gets the same amount of

6    severance, right?

7        A.   Severance cash?

8        Q.   Cash or health.  The length of time for your

9    cash or your health is dependent upon the length of time

10   you've been with the company?

11       A.   Yes.  The benefits continuation is, and the

12   cash is based upon your time with the company.  The

13   health benefits are outlined on Page 5 as to how long an

14   employee would receive those.  The appendix to this

15   would detail how much cash an employee received.

16       Q.   All right.  Depending on which sector you're

17   in, is that what you're telling me?

18       A.   No.  All sectors would follow the severance

19   plan document for benefits continuation.

20       Q.   Benefits being medical or health?

21       A.   Medical and health, right.  So that's defined

22   in the plan.  Cash is the one that is decided at the

23   sector level.

24       Q.   An employee who receives -- for the continued

25   health benefits, an employee -- two employees in the

1    same sector and the same division may receive different

2    amounts or time that they have their continued health

3    benefits, based on how long they have been employed at

4    the company; is that right?

5         A.   Correct.

6         Q.   And so for the people who continued to receive

7    continuing health benefits but did not receive any cash

8    severance payments, in those instances, their continued

9    health benefits were also subject or conditioned upon

10   how much time they had been employed at the company; is

11   that right?

12        A.   Yes.

13        Q.   Earlier we were talking about management

14   decisions, or I believe you used the term "leadership

15   decisions" with respect to each sector as to whether or

16   not the employees would receive -- whether all employees

17   who otherwise met eligibility requirements would receive

18   severance benefits.

19             Do you remember that?

20             MS. ROSS:  Objection, vague.

21        A.   Could you repeat?

22        Q.   Sure.  Let me rephrase the question for you.

23   We had a discussion earlier today about the senior

24   leadership team making decisions sector by sector.  We

25   went through AS, MS, TS, as to whether or not

Page 112

1    sector-wide employees would be eligible to receive

2    severance.

3                    Do you remember that?

4         A.   Yes.

5         Q.   Is there documentation anywhere as to what

6    decision was made?

7                    MS. ROSS:  Objection, vague.

8         A.   Are you talking about the decision that was

9    made whether the sector or that division or that subunit

10   would receive severance?

11        Q.   Correct.

12        A.   And by documentation, could you tell me what

13   you mean by that?

14        Q.   Something that someone administering the plan

15   would rely on in determining whether or not a particular

16   group of people would receive severance.

17        A.   I'm not aware of any documents for AS or MS.

18   The documents I am aware of is the decisions around what

19   TS made in October of 2011 and in 2014.

20        Q.   With respect to TS decisions, what documents

21   are you aware of?

22        A.   I'd have to look in what the document was, but

23   I'm aware of emails and PowerPoint presentations that

24   outline the decision in October of 2011 to go to the

25   high plan and to the baseline being no severance across

Page 114

1     Q.   Was there a particular person that had

2  ultimate responsibility to ensure that the form was

3  filled out or make the determination to fill out the

4  form?

5     A.   I know the program when it was rolled out said

6  that it was -- the HR person was the one who facilitated

7  the process.

8     Q.   Who had the authority to sign off on it?

9     A.   On the signatures on that form were the

10  division VP GM, the HR business leader/director and the

11  division financial person.

12     Q.   And when you say to get it approved, it was

13  those list of people?

14     A.   Yes.

15     Q.   And did that form, once it was filled out and

16  approved, go somewhere?

17     A.   I would assume so.

18     Q.   But you don't know?

19     A.   I don't know where those would be housed.

20     Q.   So how would someone who was administering the

21  plan make a determination whether a particular group,

22  unit, division, contract had been approved for

23  severance?

24          MS. ROSS:  Objection, vague.

25     A.   Are we talking about the decision to opt in

1   that unit or the decision to then go down the execution

2   of giving the -- all the documents to the employee?

3          Q.   Well, the first is to opt in.

4          A.   To opt in.

5          Q.   The form is used to opt in, correct?

6          A.   Correct.

7          Q.   So let's assume there was a decision by a

8   particular unit or contract, "In October 2011 we're

9   going to opt in," how does someone in June of 2013

10  figure out that that has happened?

11         A.   I understood that the HR director was

12  typically the one who helped with the form and then keep

13  the form as well so that in case there's ever any

14  questions later, you could go and find if they had it or

15  not.

16         Q.   Let's assume the HR director died

17  unexpectedly.  How would someone administering the plan

18  figure that out?

19              MS. ROSS:  Objection, speculation.

20         A.   And when you say administer the plan, we're

21  talking about the actual execution to get the documents

22  to the employee?

23         Q.   Well, somebody has to make a determination --

24  there has been an opt-in decision made.

25         A.   Right.

Page 116

1     Q.   And so somebody down the road has to figure

2  out whether or not this particular group has opted in or

3  not, correct?

4     A.   I'm not sure when you say somebody, but, yes,

5  it would be -- the form would be there.

6     Q.   Well, I'm trying to figure out where would the

7  form be such that somebody could figure that out.

8     A.   To your point about what if the HR director

9  died, left the company or whatever, it could very well

10  be in their hard drive in their files.  Many times those

11  are scrapped whenever a person leaves or moves offices.

12          So to my understanding, there's no

13  central depository for all those opt-in forms in TS

14  during that time.

15     Q.   Okay.  So what you are telling me is, unless

16  somebody remembered where the form was or that an opt in

17  happened, there was no administrative way to determine

18  whether a particular group had been opted in?

19          MS. ROSS:  Objection, mischaracterizes

20  his testimony.

21          MR. BARTON:  Did you get the answer?

22          THE REPORTER:  No.

23     Q.   Is your answer "correct," sir?

24     A.   Yes, it was.

25     Q.   I believe you started to say the first process

Page 122

1    eligible for severance, which means the cash payment and

2    the continuation of medical benefits.

3        Q.    And the memo that goes to the eligible

4    employees -- or the memo that's described under

5    "Eligible Employees," that memo is also not -- is not

6    provided to the employee until the time the person has

7    been targeted for layoff, right?

8        A.    The memo -- well, the severance eligibility

9    letter, which includes elements -- I'm talking current

10   time.  Okay?  So in current time, the elements that are

11   found up under "Eligible Employees" are included in the

12   severance eligibility letter.

13               That's under "Condition For Receiving

14   Benefits," and that document is given to the employee

15   after they've been notified that they're being laid off.

16       Q.    I just want to make sure I'm clear.  But

17   there's no cover memo that that goes to employees prior

18   to the time that they have been targeted for a layoff to

19   informs them whether or not this plan applies to them?

20               MS. ROSS:  Which sector?

21               MR. BARTON:  Anywhere.

22       A.    Correct.

23       Q.    Now, when you're referring to the memo or

24   letter that's described under in the "Conditions for

25   Receiving Benefits," you described that's designed to

Page 125

1      A.   Yes.  Those documents in combination is what

2  would trigger HR to know that all the conditions had

3  been met and so, therefore, the payment could be

4  processed.

5      Q.   And then they give instruction to payroll --

6  let me rephrase that.

7           HR, once they receive the documents, then

8  gives an instruction to payroll?

9      A.   Yes.

10     Q.   And so are those documents, those two

11 documents that serve as the trigger, are those

12 maintained somewhere?

13     A.   What time frame are we talking about?

14     Q.   Well, are they maintained today?

15     A.   Currently we have a document management system

16 that went online in 2008, with sectors then

17 progressively coming online up until TS came online in

18 2010.

19           There's never been a requirement, and

20 each group does it differently.  But the separation

21 agreements have never -- have never been required to be

22 put in, for example, the employee's permanent personnel

23 file, even to those instructions used earlier, what if

24 it was in an HR assistant's hard drive and that person

25 left or in a file somewhere that could have got thrown

Page 126

1    out?

2              So those documents could very well have

3    been lost due to a lack of any other way of capturing

4    them all together.

5        Q.   To your knowledge, there is no way to

6    essentially locate those documents?

7        A.   Correct.  Yeah, they are definitely scattered.

8        Q.   So does the memo itself serve as anything

9    other than a trigger to HR to pay benefits?

10             MS. ROSS:  Objection, vague.

11       A.   A purpose to who?

12       Q.   Does it serve any other purpose other than a

13   trigger to ensure that HR knows to make the instruction?

14       A.   Well, it is to also notify the employee that

15   they are eligible under the severance plan.

16       Q.   Is there any other purpose other than those

17   two?

18       A.   It goes back to what I said earlier.  Some

19   groups have put into that document now that -- saying

20   that the employee has also received a copy of the

21   severance plan document.  But, otherwise, that's the

22   only use.

23       Q.   So there's three uses.  One is to notify

24   employees that they're eligible for severance.  Two,

25   make sure they have a copy of the severance -- the

Page 127

1    employee has a copy of the severance plan document, and

2    three is to have HR trigger payment; is that correct?

3        A.   Yes, with the last -- the third point also

4    being the separation agreement has to be signed and

5    returned, yes.

6        Q.   Right.  But in terms of the memo, that's the

7    three purposes of the memo?

8        A.   Yes.

9        Q.   Now, with respect to --

10       A.   Could I add to make sure I'm clear on what

11   that means, that last question?

12       Q.   Sure.  If you need to modify, go ahead.

13       A.   Sure.  It effectively makes the employee

14   eligible.  I just want to make sure it was clear that

15   it's not just an administrative way of communicating it

16   and for us -- HR -- to take care of the payment.

17            It is essentially the key document that

18   would effect telling the employee that now -- all of the

19   severance plan description now applies to them, and they

20   are eligible according to what the plan document says.

21       Q.   So when the employee first starts to work for

22   Northrop, do they get a copy of the severance plan?

23            MS. ROSS:  Asked and answered.

24       A.   No.

25       Q.   So is the first time an employee gets a copy

1    of the severance plan or the summary plan description is
2    when they have been targeted for termination?
3              MS. ROSS:  Two objections.  One is vague.
4    Second is asked and answered.
5         A.   Could I hear it again?  I'm sorry.
6              MR. BARTON:  Read it back, please.
7         A.   An employee can get a copy of the severance
8    plan any time they want on our benefits website.  The
9    first time that it would be given directly to them would
10   be after they received a layoff notice and a set of
11   documents, the separation agreement, the severance
12   eligibility letter and all that.  Then it would be given
13   to them directly if they are getting severance benefits.
14             If they are not getting any kind of
15   severance benefits, then the severance plan would not be
16   given to them because they technically would not be
17   receiving them under the "Conditions For Receiving
18   Benefits," the first bullet point on Page 3.
19        Q.   Now, with respect to employees who were in the
20   AS sector or other sectors where you told me that they
21   would -- everyone would automatically get a memo, does
22   the lack of a memo make someone ineligible for benefits?
23        A.   When you say benefits, you're --
24        Q.   Severance benefits.
25        A.   Correct.  They have to receive the memo in

1   order to receive the severance benefits.

2        Q.   So someone who is in AS, for example, there's

3   been a determination that all employees will receive

4   severance if they work 20 hours a week and they sign the

5   release, they should get a memo, but somehow somebody

6   makes a mistake and that employee doesn't get a memo.

7   Does that make them ineligible for severance?

8              MS. ROSS:  Objection, hypothetical.

9        A.   I did ask my colleague in AS as to her

10  knowledge about history on AS, since we're talking about

11  them, and they would -- she said they always gave a

12  letter, which would then make them eligible.

13       Q.   Right.  But does the mere fact there was a

14  mistake in giving someone a memo, would that make

15  someone ineligible even though they should have gotten

16  the memo?

17             MS. ROSS:  Objection, hypothetical.

18  Assumes facts not in evidence.

19       A.   I would have to say based upon the

20  hypothetical situation that I'm not aware of, that it

21  could be possible that an employee could still receive

22  severance pay without receiving a memo, hypothetically.

23             MR. BARTON:  Why don't we take a short

24  break?

25             MS. ROSS:  Okay.

Page 160

1    and senior management within the TS organization.

2        Q.    And does this document provide guidance as to

3    determining when a severance memorandum would be issued?

4                MS. ROSS:   Objection.   The document

5    speaks for itself.

6        A.    It doesn't say when an employee would receive

7    it, only that an employee who is eligible to receive

8    severance would receive the memo.

9        Q.    Does it provide guidance as to whether a

10   particular employee would receive a memo from management

11   or the vice president of human resources advising of

12   eligibility for severance?

13               MS. ROSS:   Same objection.   The document

14   speaks for itself.

15       A.    Okay.   Can I hear the question again?

16               (Record read.)

17       A.    No, it does not.

18       Q.    Are you aware of any written document that

19   provides guidance as to whether an employee would

20   receive a memo from management or the vice president of

21   human resources advising them as to severance

22   eligibility?

23       A.    No, I'm not aware of any.

24       Q.    Do you see in the middle of the page in bold

25   there's a statement that says, "Concern:

Page 173

1     A.   The BPC code would show whether or not an

2  employee is eligible for benefits, and then by

3  extension, also benefits continuation under the

4  severance plan.

5     Q.   And when you're referring to benefits, you're

6  referring to health benefits?

7     A.   Correct.

8     Q.   Would there be people who were eligible for

9  health benefits but not entitled to health benefits

10  under the severance plan?

11          MS. ROSS:  Objection, vague.

12          MR. BARTON:  I'll rephrase the question.

13     Q.   In the data that was used for filling out the

14  Form 5500, were there people who would be eligible for

15  health benefits as current employees but would not be

16  eligible for health benefits under the severance plan?

17     A.   No.

18     Q.   Are all employees in the HR database assigned

19  a BPC code?

20     A.   Yes.

21     Q.   Are all employees in the HR database who are

22  assigned a BPC code also eligible for health benefits?

23     A.   No.

24     Q.   Do you know what subset of persons who are in

25  the HR database assigned a BPC code show up as

Page 174

1    participants for the Form 5500 severance plan?

2           MS. ROSS:  Objection, vague.

3       A.   I'm not following the question.

4       Q.   Sure.  Let me break it down.  Do you know how

5    many people are in the HR database?

6       A.   No, I don't.

7       Q.   Do you know how many people are in the HR

8    database that have a BPC code assigned to them?

9       A.   A number, no.

10      Q.   Do you know which BPC codes show up or

11   identify a person as eligible for health benefits?

12      A.   I couldn't recite them right now.

13      Q.   Are there more than one?

14      A.   Yes -- no.  I'm sorry, what do you mean by

15   one, more than one --

16      Q.   BPC code that indicates someone is eligible

17   for health benefits and, therefore, is reported as

18   eligible for severance benefits.

19      A.   Yes, yes.

20      Q.   How many of those BPC codes exist?

21      A.   Oh, dozens.

22      Q.   Did you review the list of BPC codes in

23   connection with your preparation for today's deposition?

24      A.   Yes.

25      Q.   Is this something that you have readily handy

Page 186

1      Q.   Would it be your understanding that if someone

2  was listed with a BPC code and was listed as either

3  having -- as either having severance or PJS, that then

4  they would show up as a participant on the Form 5500?

5      A.   Yes.

6      Q.   Do you have an understanding -- well, strike

7  that.

8           Do you know why there are no participants

9  reported as receiving benefits on the Form 5500?

10     A.   And which line are you referencing on the

11 5500?

12     Q.   Let's first start with the 2010, Exhibit 8.

13 Go to 6-B.

14     A.   Okay.

15     Q.   And if you look on all of them, there's no

16 reporting as to anyone receiving benefits.

17     A.   The BPC codes, obviously, a total was made

18 from those that were severance or PJS eligible, because

19 it is -- understanding that these employees have the

20 potential to participate in the severance plan.  So that

21 was what I understood to be what was on 6-A, is because

22 we would view it as what's a potential participation in

23 the plan.

24     Q.   I understand, but my question was:  On the

25 Line 6-B, as to persons receiving benefits, there's no

Page 187

1    reporting of anyone receiving benefits between 2010 and

2    2015 on the 5500.  Do you know why that is?

3         A.   No, I do not know why.

4         Q.   Is that a question that you asked when you

5    reviewed the 2010 5500 in preparation for your

6    deposition?

7         A.   I don't recall.

8         Q.   And was Ms. Sholinsky the person responsible

9    for preparing the data for the Form 5500s between 2010

10   and 2015?

11        A.   I know that she has done it for a few years.

12   I did not get exactly what years she covered.

13        Q.   Do you know who Mr. Kenneth Heintz is?

14        A.   No, I do not.

15        Q.   Do you know who Prabu Natarajan is?

16        A.   He was our VP of tax.

17        Q.   Did you say VPO?

18        A.   No.  I'm sorry, he was our vice president of

19   tax.

20        Q.   Do you know if he's still with the company?

21        A.   I believe Prabu still is, yes.

22        Q.   For purposes of preparing for your deposition,

23   did you have any conversations with him about the Form

24   5500s?

25        A.   No, I did not.

Page 191

1    one of the documents that is listed on Exhibit Number B.

2              Do you need a pen?

3         A.   Yes, please.  I dropped mine.

4              (Pause in proceedings.)

5         A.   Yes, I have them.

6              MR. BARTON:  Just for the record, Exhibit

7    16 is NGC 1098 through 1099.  Exhibit Number 17 is NGC

8    3739.  Exhibit Number 18 is NGC 1172 through 1173.

9    Exhibit 19 is NGC 14354 through 56.  Exhibit Number 20

10   is NGC 1170 through 71.  And Exhibit Number 21 is NGC

11   1174 through 75.

12        Q.   And you agree those are all the documents that

13   are listed on Exhibit B, correct?

14        A.   Yes.

15        Q.   And would you agree that this constitutes the

16   universe of communications or disclosures issued to the

17   plan participants between 2010 and the present that

18   would have informed participants of any changes to the

19   plan?

20        A.   When you say participants, are we talking

21   about participants under 5500 or under the severance

22   plan?

23        Q.   Participants under the severance plan, whether

24   they were identified in the 5500 or not.

25              MS. ROSS:  In addition to the documents

Page 193

1      Q.   And you don't consider that to be a change?

2      A.   It would be a change to how severance was paid

3    or if you were eligible for it, but it would not be a

4    change to the severance plan document.

5      Q.   Okay.  To your understanding, has the

6    severance plan document remained unchanged between 2010

7    and the present?

8      A.   It has remained unchanged other than to

9    upgrade addresses.  For example, the company

10   headquarters moved from California to Virginia, and they

11   updated that.  And then anything that was under -- on

12   the first page where there were exclusions, those have

13   changed from plan to plan, but, otherwise, no other

14   changes.

15     Q.   And as you mentioned, there was a change with

16   respect to ES employees who were then eligible to

17   participate in the severance plan rather than the

18   Westinghouse plan, correct?

19     A.   Correct.

20     Q.   And is that what is being conveyed with

21   respect to Exhibit Number 16?

22     A.   Correct.

23     Q.   And would you agree with me that when those --

24   strike that.

25               Was there any other communication other

Page 194

1    than Exhibit Numbers 16 or 17 that was made to those

2    employees --

3              MS. ROSS:  Objection, vague.

4         Q.  -- about the severance plan?

5              MS. ROSS:  It's still vague.

6         A.  Not to my knowledge.  These were the only

7    communications I'm aware of.

8         Q.  And if you look at Exhibit Number 16, down at

9    the bullet point, the bottom bullet point, it references

10   the severance benefit.  Do you see that?

11        A.  Yes.

12        Q.  And this communication:  "ES nonrepresented

13   employees who are laid off as part of any workforce

14   reduction will be covered by the provisions of the

15   Northrop Grumann severance plan," do you see that?

16        A.  Yes.

17        Q.  And then it says:  "The plan provides eligible

18   employees with a cash separation payment, an extension

19   of medical, dental and vision health coverage."

20              Do you see that?

21        A.  Yes.

22        Q.  And would you agree with me that in that

23   paragraph and nowhere else in this document is there any

24   discussion that there is a requirement that a memo be

25   distributed to them in order for them to receive those

Page 195

1    benefits?

2         A.    There is no memo listed here in Exhibit 16.

3         Q.    Are you aware of any disclosure that was made

4    to the ES employees that they would only get severance

5    if they received a memo from the vice president of human

6    resources?

7         A.    Could you repeat that?

8               MR. BARTON:  Can you read that back?

9               (Record read.)

10        A.    No, I'm not aware of any.

11        Q.    With respect to Exhibit Number 17, it's

12   another communication to ES employees, correct?

13        A.    Yes.

14        Q.    Do you know when this was dated or sent?

15        A.    No, I do not.

16        Q.    Had you seen this document before?

17        A.    Yes.

18        Q.    And have you seen Exhibit Number 16 before?

19        A.    Yes.

20        Q.    And both of these documents appear to be true

21   and correct copies that would have been sent to the ES

22   employees?

23        A.    Yes.

24        Q.    And would they have been sent to all ES

25   employees?

Page 196

1      A.    Although I can't see an addressee line, but it
2  looks like it would have gone to all employees.
3      Q.    And that's true for both Exhibits 16 and 17?
4      A.    Yes.
5      Q.    And also in Exhibit Number 17, there's also no
6  mention of a memo that needs to be received from the
7  vice president of human resources, correct, in order to
8  receive severance benefits under the severance plan?
9      A.    Correct.  There's no mention of a memo.
10     Q.    Look at Exhibit Number 18.  Are you familiar
11 with Exhibit Number 18?
12     A.    Yes.
13     Q.    Can you explain to me what Exhibit Number 18
14 is?
15     A.    18 is a newsletter that was used within
16 divisions in the TS sector.
17     Q.    Are you familiar with a document entitled
18 "Missile Minute"?
19     A.    I am now through preparation.
20     Q.    What is the "Missile Minute"?
21     A.    As I understood, it was essentially an
22 employee newsletter that the division would put out for
23 updates.
24     Q.    Did you understand -- strike that.
25            Do you see the reference down below to

Page 197

1    "Pension, Retirement and Severance" on Exhibit Number

2    18?

3        A.   Yes, I do.

4        Q.   Do you understand the purpose of providing

5    this information to ILMD employees?

6        A.   No.  I do know what triggered sending all this

7    information to them.

8        Q.   Do you know whether "Missile Minute" was sent

9    to all ILMD employees?

10       A.   I do not know that I could necessarily prove

11   it, but I understood it went to them.

12       Q.   You understand that based on your preparation

13   for today's deposition?

14       A.   Yes.

15       Q.   Why don't you take a look at Exhibit Number

16   19?  Have you seen this document before?

17       A.   Yes.

18       Q.   Can you explain to me what this document is?

19       A.   This is a document sent by the TS sector

20   communications group to all TS employees.

21       Q.   Does it appear to be a true and correct copy

22   of this document?

23       A.   Yes.

24       Q.   And on the second page, there's a reference to

25   "Severance Plan Changes For U. S. Based Technical

Page 198

1    Service Employees."

2              Do you see that?

3        A.   Yes.

4        Q.   Did you understand the purpose of this

5    communication?

6        A.   The purpose of the communication was to

7    announce to the TS organization that benefit --

8    severance plan benefits would be available to all

9    eligible employees within the sector.  That was

10   obviously a shift from what had happened between 2011 to

11   2014 where employees -- no one was getting severance

12   unless they opted into the plan.

13             Based upon employee feedback, TS decided

14   to tell everyone the change and how now everyone in TS

15   would be eligible to participate in the plan if they met

16   the eligibility requirements within the severance plan

17   document.

18        Q.   Was there any communication in 2011 about the

19   opt-in program?

20        A.   To whom are you referencing?

21        Q.   I'm sorry, to TS employees.

22        A.   No.

23        Q.   Was there any communication at all to TS

24   employees about how anything with respect to severance

25   would change until the "Missile Minute" in 2013?

Page 199

1     A.   No, not to my knowledge.

2     Q.   Are you aware of any communication that would

3 have disclosed to employees in technical services prior

4 to the time they had been identified to be terminated

5 that a memo from the vice president of human resources

6 would be necessary to receive severance benefits?

7               MS. ROSS:  Other than what he's testified

8 to today?

9               MR. BARTON:  I don't think he's testified

10 to anything.

11              MS. ROSS:  Well, he's testified the SPD

12 was on the web.

13              MR. BARTON:  Nancy, that's not proper.

14              MS. ROSS:  Joe, you're trying to put --

15              MR. BARTON:  I'm not.

16              MS. ROSS:  You're trying to trick him,

17 and it's just not appropriate.

18              MR. BARTON:  I'm not.

19              MS. ROSS:  He's testified time and time

20 again today about this same subject.

21              MR. BARTON:  Nancy, your speaking

22 objections are not appropriate.

23              MS. ROSS:  Nor are your questions over

24 and over on this same subject appropriate.

25              MR. BARTON:  If you think I'm asking the

Page 200

1    same question, you can say "asked and answered."

2                    Please read back my question.

3                    (Record read.)

4                    MS. ROSS:  Objection, asked and answered.

5         A.    No.

6         Q.    Would you agree with me that Exhibit Number 19

7    does not disclose that a memo -- strike that.

8                    Within the TS sector between 2011 and

9    2014, were financial implications or financial

10   considerations, did that play a role in deciding whether

11   or not a particular program was going to receive

12   severance?

13        A.    Yes.

14        Q.    Was that fact disclosed to participants?

15        A.    Not to my knowledge.

16        Q.    Do you have an understanding in terms of what

17   factors went into -- the financial factors that went

18   into assessing whether a particular program or division

19   was going to receive severance?

20        A.    Not necessarily the details, but I do know

21   that TS, especially when it was put together and even

22   until today, runs on a very low margin, and so they do

23   watch very carefully each program, contract, division to

24   make sure they are hitting their financials.  So

25   affordability has always been a key word used in TS.

Page 201

1              So it would have been for whatever the

2      situation was at the time for the division to make

3      whatever decision they needed to for severance and,

4      actually, lots of different things that they would

5      participate in with the company.

6          Q.   Between 2011 and 2014, were there any

7      disclosures to employees of TS prior to layoff whether

8      they would receive a memo if they were laid off and met

9      other eligibility criteria in the plan?

10         A.   No, not to my knowledge.

11         Q.   So earlier today we had -- we had talked about

12     the discovery that there were employees who continued to

13     receive health benefits based on the BPC code.  Do you

14     remember that?

15         A.   Yes.

16         Q.   Prior to October 2011, were there employees

17     who were laid off who did not receive an eligibility

18     memo but received continued health benefits?

19         A.   Understanding the BPC code and the fact that

20     also in combination with the use of the reduction in

21     force separation code, it is highly probable that an

22     employee would receive benefits, even though they did

23     not receive an eligibility letter.

24         Q.   And would the answer be the same that prior to

25     2011, it would have been highly probable that employees

Page 203

1    about severance eligibility.  Severance eligibility

2    memos are separate from the layoff notification forms.

3                    MR. BARTON:  Can you read the answer

4    back?

5                    (Record read.)

6        Q.   Are you aware of any forms provided in

7    connection with a layoff that do indicate a yes or no as

8    to whether or not someone is eligible for severance?

9        A.   A severance eligibility memo clearly states

10   that by receiving this signed by the VP of HR or the

11   DOA, that they are now eligible to receive benefits

12   under the severance plan.

13       Q.   Are there any forms that would indicate --

14   that would be sent to an employee or provided to an

15   employee that would indicate the employee is not

16   eligible for severance?

17       A.   No.

18                    MR. BARTON:  Why don't we do this, why

19   don't we take a ten-minute break?  I'm not done, but I'm

20   close to being done, or at least I'm hoping in ten

21   minutes I will be closer to being done.

22                    (Recess.)

23                    (Exhibits 22 - 23 marked.)

24       Q.   I've handed you what's been marked as Exhibits

25   22 and 23.  It's entitled "Layoff/RIF Approval Request."

1    reasons why there are 751 people identified as

2    participants in the Form 5500 who did not receive cash

3    severance pay?

4         A.   We defined participants under Form 5500 as

5    those who are potentially -- who could potentially

6    participate in the severance plan.  As I understand the

7    information at the top of the page, this was those

8    employees who had a layoff code but did not receive any

9    cash severance.

10        Q.   Do you know if this includes people who, for

11   example, didn't return a separation agreement?

12        A.   So this could be lots of different points.  It

13   could be, correct, somebody who did not return a

14   separation agreement, right.  It --

15        Q.   Other than -- I'm sorry, go ahead.

16        A.   It could have been somebody who was laid off

17   and then rehired fairly quickly, so they have a -- they

18   would have had a code that showed a layoff at one point

19   and they'd come back.  I've had those happen with

20   employees too.  Those would be the primary reasons that

21   it would have been.

22        Q.   And for a sector like aerospace systems, would

23   there be any other reasons?

24        A.   For aerospace, it would typically be -- we've

25   had employees who just didn't return back the separation

1   agreement.  That means they definitely want to take up

2   some sort of litigation against the company.  Some

3   forget.  Some have moved away.  So at the end of it,

4   it's just we have never received the separation

5   agreement back.

6       Q.  My question is:  Because with aerospace

7   systems, everyone is entitled to receive the memo?

8       A.  Correct.

9       Q.  So, for example, for aerospace systems, there

10   were 29 people in the last four years who didn't receive

11   a cash payment for severance.  Is there any other reason

12   other than them either not returning the release

13   agreement or somehow becoming -- returning to work that

14   they would not have gotten severance?

15       A.  No.

16       Q.  And for technical services, at least prior

17   to -- is it prior to 2014 or 2015 -- that would have

18   been a determination by -- also by program or division;

19   is that right?

20          MS. ROSS:  Objection, vague.

21       A.  Well, it could have been many different

22   factors.

23       Q.  For technical services, what would the factors

24   be?

25       A.  It could have been the employees were not

Page 221

1    not think of an instance in which severance benefits had

2    been paid where there was not an eligibility memo

3    received?

4         A.   Correct.

5         Q.   And was there any -- was there any way, to

6    your knowledge, that they could verify that?

7              MS. ROSS:  Objection, vague.

8         Q.   They could determine that by looking for

9    documentation, was there any way, to your knowledge,

10   they could determine that by looking for documentation?

11             MS. ROSS:  Objection, vague.

12        A.   Could you repeat it?

13        Q.   Sure.  Let me see if I can be clearer.  Are

14   the memos that are provided to employees retained in any

15   way?

16        A.   They could have been retained locally in

17   different HR files.

18        Q.   But there's no way that somebody can verify

19   today, to your knowledge, whether or not benefits were

20   paid and an eligibility memo was sent or received by the

21   employee?

22             MS. ROSS:  Objection, mischaracterizes

23   his testimony.

24             MR. BARTON:  I'm not characterizing

25   anything.

Page 222

1        A.    Repeat.

2                   (Record read.)

3        A.    Correct.

4                   MR. BARTON:  Nothing further.

5                   MS. ROSS:  We'll reserve signature.

6                   (Deposition concluded at 5:52 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25