# **EXHIBIT A**

Page 1

1           IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION
3    ALAN CARLSON & PETER    §
     DeLUCA, individually    §
4    and on behalf of a      §
     class of similarly      §
5    situated individuals,   §
          Plaintiffs,        §
6                            §
     VS                      §    Civil Action No. 13-cv-2635
7                            §
     NORTHROP GRUMMAN        §
8    CORPORATION and the     §
     NORTHROP GRUMMAN        §
9    SEVERANCE PLAN,         §
          Defendants.        §
10
11
12   ---------------------------------------------------------
        ORAL DEPOSITION OF NORTHROP GRUMMAN CORPORATION
13
                        SERVICE PLAN
14
      BY AND THROUGH ITS DESIGNATED 30(B)(6) REPRESENTATIVE
15
                     MICHAEL LEE PENKERT
16
                     DECEMBER 16, 2016
17   ---------------------------------------------------------
18
19           ORAL DEPOSITION OF NORTHROP GRUMMAN
20   CORPORATION SERVICE PLAN BY AND THROUGH ITS DESIGNATED
21   30(B)(6) REPRESENTATIVE MICHAEL LEE PENKERT, produced as
22   a witness at the instance of the PLAINTIFFS, and duly
23   sworn, was taken in the above-styled and numbered cause
24   on the 16th day of December, 2016, from 9:25 a.m. to
25   5:52 p.m., before TINA TERRELL BURNEY, CSR in and for

Page 2

1    the State of Texas, reported by machine shorthand, at

2    the offices of Northrop Grumman Corporation, 8710

3    Freeport Parkway, Irving, Texas 75063, pursuant to the

4    Federal Rules of Civil Procedure.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                    Veritext Legal Solutions

                       Mid-Atlantic Region

                  1250 Eye Street NW - Suite 350

24                    Washington, D.C.  20004

25

Page 71

1      Q.   With respect to TS where the decision, at

2    least prior to February 2014 -- strike that.  Let me

3    rephrase the question.

4              With respect to TS, prior to February of

5    2014 where eligibility for severance was dependent on

6    each division, operating unit or even program or

7    contract, with respect to providing employees a cover

8    memo or a severance eligibility letter, how was that

9    process made or determined?

10      A.   Are you speaking to the process to where they

11   actually received the documents?

12      Q.   I'm talking about the process in deciding who

13   would receive -- who would receive the cover memo or

14   severance eligibility letter.

15      A.   That's actually two steps.  From 2011 to 2014,

16   the TS sector enacted a -- again, a high plan, but then

17   it would be on a division-by-division subunit, even down

18   to contract level, that that division general manager

19   and the HR person who supports the division, they would

20   take a look at the situation, usually around financials,

21   to then determine whether or not that division, subunit,

22   contract, that they were going to extend layoff --

23   severance benefits to anyone who was laid off.

24              There was actually a form that was

25   implemented that then would be put in place for that

Page 72

1    division GM, HR person and the sector financial person

2    to capture their decision on whether or not to provide

3    benefits for, again, that division, whatever.

4                    So in other words, that new form that was

5    put in from 2011 to 2014 was essentially opting people

6    into paying severance.  So TS as a whole had decided to

7    high plan, but on a case-by-case basis.

8                    So each division then had to -- every

9    time a decision was made or an action was taken around a

10   layoff, would -- their division GM would have to

11   generate that -- let's see, it was the severance plan

12   authorization form.

13                   And then that would be reviewed and then

14   a determination was made for, however that group was

15   defined, whether or not that group was going to get

16   severance benefits.  That was Step 1.

17                   Step 2 is, then based upon that decision,

18   then the HR team would execute -- administer, like I

19   said earlier, the plan to if the employees were getting

20   benefits and also met the eligibility requirements that

21   you see in the plan document, that they would make sure

22   the employee received all the material that we've

23   described before, including the severance eligibility

24   document.

25                   If a decision was made not to give that

Page 73

1    subunit any benefits, then essentially the employee

2    would receive the reduction in force notification letter

3    just essentially saying that, "You are being laid off."

4         Q.   And the decision that was being made was being

5    made on a -- at least a group-by-group contract?

6              MS. ROSS:   Objection, form.

7         A.   Correct.

8         Q.   Is that right?

9         A.   I'm sorry?

10        Q.   The decision that was being made is by groups.

11   Whether they be a particular operating unit or program

12   or contract, it's by group, not individually?

13             MS. ROSS:   Objection, vague.

14        A.   Well, the decision was being made by the

15   division general manager, in support with HR and finance

16   on which division would get the benefits.  It could also

17   go down to even to a level of a contract based upon the

18   financials for that group.

19        Q.   But if it went all the way down to a contract,

20   it would be all individuals on the contract?

21        A.   Correct.

22        Q.   And was that decision being made with respect

23   to a particular division, particular contract at the

24   time that people were being terminated or some prior

25   time?

Page 74

1      A.   The discussion was typically started whenever
2   there was indications that they had to do some sort of
3   reduction in force.  So as part of the process of even
4   who is going to be affected by the reduction in force,
5   who may be leaving and who may be staying, the
6   discussion would always be at the beginning of, "So are
7   we going to look to give the severance to -- are we
8   going to opt this group into the plan, the high plan,
9   for this?"
10                   And then it would start the process that
11   I described earlier on the form, where they would do the
12   review and make sure so all that was in place before the
13   final decision was made, and then for -- and definitely
14   before the employee was ever notified.
15      Q.   But the decision as to whether or not a
16   particular division, contract, program would
17   participate, or those employees would be eligible for
18   severance was made only after there was a determination
19   that people were going to be laid off?
20      A.   Well, the baseline was that in TS from 2011 to
21   2014, that no one would receive benefits, so you had to
22   opt in.  So the opting in was done on a
23   division-by-division basis.  Those decisions sometimes
24   could have been made even as early as soon as the
25   program -- sorry.

Page 75

1          The new approach to severance was

2    announced in 2011.  It could have been made as early as

3    that, or it could have been made closer to whenever they

4    have determined that a certain group was going to be

5    affected through a layoff.

6          Q.   So some -- you're telling me some divisions

7    within TS may have made a decision as of, say, October

8    2011, "All employees in our division are going to get

9    severance"?

10         A.   They could have, then opted in, filling out

11   the forms so it is being reviewed.  I do know that

12   certain divisions had decided that they were going to

13   not pay anyone, but they still had the opportunity to

14   later on, if they wanted to opt them in, they could.

15         Q.   Do you know which divisions made which

16   decisions?

17         A.   I do not.

18         Q.   Do you know who would know that?

19         A.   It would probably be the HR VP or business

20   leaders for each of those groups.

21         Q.   And if you wanted to find that information

22   out, where would you go?

23         A.   I'd have to look in our company database to

24   determine who the HR people were at the time for those

25   groups.

Page 200

1    same question, you can say "asked and answered."

2                    Please read back my question.

3                    (Record read.)

4                    MS. ROSS:  Objection, asked and answered.

5        A.    No.

6        Q.    Would you agree with me that Exhibit Number 19

7    does not disclose that a memo -- strike that.

8                    Within the TS sector between 2011 and

9    2014, were financial implications or financial

10   considerations, did that play a role in deciding whether

11   or not a particular program was going to receive

12   severance?

13       A.    Yes.

14       Q.    Was that fact disclosed to participants?

15       A.    Not to my knowledge.

16       Q.    Do you have an understanding in terms of what

17   factors went into -- the financial factors that went

18   into assessing whether a particular program or division

19   was going to receive severance?

20       A.    Not necessarily the details, but I do know

21   that TS, especially when it was put together and even

22   until today, runs on a very low margin, and so they do

23   watch very carefully each program, contract, division to

24   make sure they are hitting their financials.  So

25   affordability has always been a key word used in TS.

Page 201

1              So it would have been for whatever the

2    situation was at the time for the division to make

3    whatever decision they needed to for severance and,

4    actually, lots of different things that they would

5    participate in with the company.

6        Q.   Between 2011 and 2014, were there any

7    disclosures to employees of TS prior to layoff whether

8    they would receive a memo if they were laid off and met

9    other eligibility criteria in the plan?

10       A.   No, not to my knowledge.

11       Q.   So earlier today we had -- we had talked about

12    the discovery that there were employees who continued to

13    receive health benefits based on the BPC code.  Do you

14    remember that?

15       A.   Yes.

16       Q.   Prior to October 2011, were there employees

17    who were laid off who did not receive an eligibility

18    memo but received continued health benefits?

19       A.   Understanding the BPC code and the fact that

20    also in combination with the use of the reduction in

21    force separation code, it is highly probable that an

22    employee would receive benefits, even though they did

23    not receive an eligibility letter.

24       Q.   And would the answer be the same that prior to

25    2011, it would have been highly probable that employees