**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALAN CARLSON & PETER DELUCA, individually and on behalf of a class of similarly situated individuals, | Civil Action No. 13-cv-2635 |
| | Judge Andrea Wood |
| Plaintiffs, | Magistrate Judge Maria Valdez |
| v. | |
| NORTHROP GRUMMAN CORPORATION and the NORTHROP GRUMMAN SEVERANCE PLAN, | |
| Defendants. | |

## <u>PLAINTIFFS' LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS</u>

Plaintiffs, ALAN CARLSON and PETER DELUCA, individually and on behalf of a class of similarly situated individuals, by and through their undersigned attorneys, pursuant to Local Rule 56.1(a)(3) of this Court, hereby submit the following Statement of Material Facts in support of their Motion for Summary Judgment:

### <u>Jurisdiction and Venue</u>

1.      The Northrop Grumman Severance Plan is a welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA") that provides severance benefits to eligible employees.  (Ex. A-5, Penkert Dep. Ex. 5, at NGC03488–98; Ex. A, Penkert Dep. at 130:2–131:1).  Jurisdiction of this Court is thus based on federal question, granted under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331. (Dkt. #62, Am. Compl., ¶¶ 7–8; Dkt. #129, Answer, ¶¶ 7–8).

2.      The named plaintiffs, Carlson and DeLuca, at all relevant times resided in the

Northern District of Illinois, making venue proper under 29 U.S.C. § 1132(e)(2).  (Dkt. #62, Am.

Compl., ¶ 9; Dkt. #129, Answer, ¶ 9).

## Plan Terms

3.      The 2010 Summary Plan Description "serves both as the official Plan document

and the summary plan description.  The terms of the Plan control over the Guide to

Administration or any other supporting documents."  (Ex. A-5, Penkert Dep. Ex. 5, at

NGC03497).  The 2010 Severance Plan states: "This is a Severance Plan that is being offered to

selected employees of Northrop Grumman Corporation and its affiliates (the "Company") who

receive a notice of layoff.  The fact that you have received this document does not necessarily

mean that you are eligible for severance benefits; you must also have received a cover memo,

signed by a Vice President of Human Resources (or his/her designee), with this document,

addressed to you individually by name."  (*Id.* at NGC03490).

4.      Under the 2010 Summary Plan Description:

**ELIGIBLE EMPLOYEES**

You are an eligible employee if you work in the United States, you are regularly scheduled to
work at least 20 hours per week and you have been notified in writing by your management that
you are covered by this Plan.  If you are represented by a union, you are eligible only if your
collective bargaining agreement provides for participation in this plan.  The fact that you
received this document does not necessarily mean that you are eligible; you must also have
received a cover memo, signed by a Vice President of Human Resources (or his/her designee),
with this document addressed to you individually by name.

**CONDITIONS FOR RECEIVING BENEFITS**

In order to receive the benefits of this Plan, you must meet all the following conditions:

- You must be designated as eligible for this plan by a Vice President of Human Resources
  (or his/her designee).  You are designated if you received a memo addressed to you,
  notifying you of your eligibility for this benefit.

- You must remain employed in your current position until you are laid off by your management. You must actually be laid off by the Company. If, before your layoff date, you voluntarily quit, retire, are terminated for cause, or transfer to another position within the Company, you will not receive benefits under this Plan.

- You must sign a Confidential Separation Agreement and General Release that will include, among other things, a release of any and all claims that you may have against the Company.

The following conditions also apply if your job moves, or your business unit is sold:

- If your current job moves more than 50 miles from your current work location, and you elect to terminate your employment instead of relocating, your termination will be treated as a layoff.

- If your business unit is sold and you are not offered similar employment with the buyer at the time of the closing of the sale, you may terminate employment as a layoff within 30 days of the closing date. For purposes of this Plan, "similar employment" means any job that pays at a base salary of at least 85% of your pre-sale base salary; it does not include overtime or bonus opportunities, fringe benefits, or other aspects of employment.

(Ex. A-5, Penkert Dep. Ex. 5, at NGC03491). On the preceding page, it states: "Note: An Appendix to the plan contains specific information about the cash portion of the benefit that you are eligible to receive. Your Human Resources department upon request will provide you with a copy of the Appendix." (*Id.* at NGC03490). "Benefits under the Plan consist of two parts: a cash payment, and an extension of your existing medical, dental and vision coverages." (*Id.* at NGC03492). "If you qualify for benefits under this Plan, you will receive an extension of your medical, dental, and vision benefits at active rates, for a period equal to one week for each Year of Service, up to a maximum of 26 weeks." (*Id.* at NGC03493).

5. The Plan also has had a Guide to Administration since 2002, which states management can offer employees regular or enhanced severance benefits. (Ex. B-2, Sholinsky Dep. Ex. 2, at NGC01022; Ex. B, Sholinsky Dep. at 42:5–43:20; Ex. J-11, Turner Dep. Ex. 11, at NGC03477–86; Ex. J, Turner Dep. at 175:25–177:2).

Once severance has been adopted by a business sector, Human Resources should provide a general notification to employees informing them of this new

> benefit . . . . Those receiving severance must be individually notified.  This will
> require HR to prepare a memo addressed to each employee with a copy of the
> Severance SPD attached to it.

(Ex. B-2, Sholinsky Dep. Ex. 2, at NGC01022).  "Management has discretion to offer different

levels of cash benefits based on a job category."  "Each Sector must determine the cash based

formula for their businesses, obtain Sector President approval and submit to Corporate

Compensation for record keeping."  (*Id.* at NGC01023).

> **Delivery of Benefits**
>
> **Benefits Continuation:** For those employees on eFlex, Benefits Administration
> will program their database so that all employees who have been laid off will
> receive medical coverage equal to end of the month plus one additional month
> free to the employee as well as the extended period of cost sharing equal to years
> of service. **IT IS UP TO EMPLOYEE RELATIONS TO NOTIFY
> BENEFITS ADMINISTRATION IF THE EMPLOYEE EITHER WAS NOT
> OFFERED SEVERANCE OR REFUSED TO SIGN THE RELEASE
> AGREEMENT**, so that if required, benefits after the free period is charged at
> normal COBRA rates.

(*Id.* at NGC1026 (emphasis in original)).

6.      Regarding reporting, the Guide to Administration states:

> These severance benefits are subject to the federal Employee Retirement Income
> Security Act of 1974, as amended ("ERISA").  Among other things, this law
> requires that the Company must file an annual report each year with the IRS that
> reports the total number of employees who participated in the Plan during the
> preceding year.
>
> In order to satisfy this legal requirement Sectors must immediately report to
> Corporate Human Resources the total number of employees that have been
> <u>offered</u> these benefits (not the number who were laid off and received benefits).
>
> …
>
> At year-end, the Manager, Benefits Reporting and Compliance will compile a
> total number of employees offered eligibility under the Severance Plan, and report
> this on the appropriate IRS form.  Just like in the medical plan context where
> many different HMOs and indemnity options may be offered under one umbrella
> plan, all versions of these severance benefits are one "plan" for purposes of
> ERISA.

4

(Ex. B-2, Sholinsky Dep. Ex. 2, at NGC01027) (emphasis in original).

7.     On December 15, 2011, Northrop Grumman adopted a new "wrap plan"

document that incorporates its component plans.  (Ex. A-6, Penkert Dep. Ex. 6, at NGC00204–

27; Ex. A, Penkert Dep. at 132:2–11).

8.     On January 1, 2012, Northrop Grumman issued the 2012 version of the Northrop

Grumman Severance Plan Summary Plan Description.  (Ex. A-3, Penkert Dep. Ex. 3, at

NGC06970–80; Ex. A, Penkert Dep. at 60:20–61:9).  The 2012 Summary Plan Description

"serves as part of the official Plan document and is the summary plan description for the Plan.

The terms of the Plan control over the Guide to Administration or any other supporting

documents."  (Ex. A-3, Penkert Dep. Ex. 3, at NGC06978).  Regarding eligibility and conditions

to receive benefits, it states:

**ELIGIBLE EMPLOYEES**

You are an eligible employee if you work in the United States, you are regularly scheduled to
work at least 20 hours per week and you have been notified in writing by your management that
you are covered by this Plan.  If you are represented by a union, you are eligible only if your
collective bargaining agreement provides for participation in this plan.  The fact that you
received this document does not necessarily mean that you are eligible; you must also have
received a cover memo, signed by a Vice President of Human Resources (or his/her designee),
with this document addressed to you individually by name.

In addition to the above rules regarding eligibility, the following employees are specifically
underlined_excluded from participating in this Plan:

- Employees of the Electronic Systems Sector who work at BWI, Annapolis, Sykesville
  (Including FE&S employees and FE&S offsite offices and facilities), Troy Hill,
  Sunnyvale or Kings Bay.

- Employees of the Technical Services Sector who are classified by the Company as being
  in the following employment categories:
  - Service Contract Act (SCA) employees
  - Union Represented employees
  - Employees covered by a Memorandum of Understanding between the TS Sector
    and ES Sector providing for the temporary assignment of the employee to the TS
    Sector and retention of participation in the ES Sector employee benefit programs

5

**CONDITIONS FOR RECEIVING BENEFITS**

In order to receive the benefits of this Plan, you must meet all the following conditions:

- You must be designated as eligible for this plan by a Vice President of Human Resources (or his/her designee). You are designated if you received a memo addressed to you, notifying you of your eligibility for this benefit.

- You must remain employed in your current position until you are laid off by your management. You must actually be laid off by the Company. If, before your layoff date, you voluntarily quit, retire, are terminated for cause, or transfer to another position within the Company, you will not receive benefits under this Plan.

- You must sign a Confidential Separation Agreement and General Release that will include, among other things, a release of any and all claims that you may have against the Company.

The following conditions also apply if your job moves, or your business unit is sold:

- If your current job moves more than 50 miles from your current work location, and you elect to terminate your employment instead of relocating, your termination will be treated as a layoff.

- If your business unit is sold and you are not offered similar employment with the buyer at the time of the closing of the sale, you may terminate employment as a layoff within 30 days of the closing date. For purposes of this Plan, "similar employment" means any job that pays at a base salary of at least 85% of your pre-sale base salary; it does not include overtime or bonus opportunities, fringe benefits, or other aspects of employment.

(*Id.* at NGC06972–73). On the preceding page, it states: "Note: An Appendix to the plan contains specific information about the cash portion of the benefit that you are eligible to receive. Your Human Resources department upon request will provide you with a copy of the Appendix." (*Id.* at NGC06971). "Benefits under the Plan consist of two parts: a cash payment, and an extension of your existing medical, dental and vision coverages." (*Id.* at NGC06973). "If you qualify for benefits under this Plan, you will receive an extension of your medical, dental, and vision benefits at active rates, for a period equal to one week for each Year of Service, up to a maximum of 26 weeks." (*Id.* at NGC06974). "[T]here are no other Plan documents that govern your benefits." (*Id.* at NGC06979).

9.      In July 2013, the Northrop Grumman Technical Services Sector drafted its own "Severance Plan Administration Guide."  (Ex. C-4, Collins Dep. Ex. 4, at NGC14519–36; Ex. C, Collins Dep. at 61:3–62:14).  It states: "Under the Severance Plan, employees who are laid off and are <u>properly notified of their eligibility</u> can receive a cash payment provided that they sign a Separation Agreement and General Release."  (Ex. C-4, Collins Dep. Ex. 4, at NGC14521 (emphasis added)).  Regarding Plan Eligibility, it states:

1.1 In order for an employee to be eligible for benefits under the Severance Plan, all of the following conditions must be met:

a.  The division or functional organization in which the employee works must have adopted the Plan, and the contract or program on which the employee is employed must not be excluded from participation in the Plan.

b.  Employee must be a regular full-time or part-time employee working a minimum of 20 hours per week.  On-call employees, interns, and part-time employees working less than 20 hours are not eligible for severance under this plan.

c.  Employee must not be covered by a collective bargaining agreement (unless the Plan has been adopted to cover the employee as a result of collective bargaining negotiations). Refer to collective bargaining agreement for specifics on administration of severance within the CBA.

d.  Service Contract Act (SCA) employees are not eligible for benefits under the Severance Plan.

e.  Employee's primary work location is in the United States.  (Employees who are on an international assignment with a non-U.S. work location (e.g., they are assigned to Northrop Grumman Information Technology Overseas, Inc. (NGITOI), or are employed by a foreign subsidiary of Northrop Grumman, do not participate in the severance program. Please contact eth Northrop Grumman Corporate Global Mobility Office for Information on country-specific benefits.).

f.  Employee whose layoff is due to a contract termination, and has been offered a comparable position and pay rate with a successor contractor or subcontractor (i.e., 'incumbent transfer' scenarios), is not eligible for benefits under the Severance Plan. If employee is offered such a position and declines, employee will not be eligible for benefits under the Severance Plan.

g.  Employee whose layoff is due to contract must have been offered a comparable position and pay rate with a successor contractor or subcontractor.

              If employee is offered such a position and declines, employee will not be eligible for severance.

    h.    Employee receives a written notice from the Vice President of Human Resources & Administration or his/her designee identifying the employee as eligible for Plan benefits.

    i.    Employee is actually laid off from employment.

(Ex. C-4, Collins Dep. Ex. 4, at NGC14522). This guide states nothing about management discretion to compel the Vice President of Human Resources or his/her designee to withhold the written notice. (*Id.* at NGC14522–23). Under the Section called "Notifications," that Guide lists "Eligibility for Northrop Grumman Severance Plan Notice addressed to the affected employee and signed by the HR Director <u>notifying the employee of his/her eligibility for benefits</u> under the Severance Plan . . . The <u>cover memo will notify the employee of the number of weeks of severance payment due and the date used to calculate payment</u>." (*Id.* at NGC14525–26 (emphases added)). Nothing in this Guide's description of eligibility states any grounds on which the notification of eligibility can be withheld except for the stipulations listed in that Guide's list of eligibility criteria. (*Id.* at NGC14522–23).

        10.    Effective February 1, 2014, Northrop Grumman revised the Summary Plan Description. (Ex. D-20, Doshi Dep. Ex. 20, at NGC01342–1352; Ex. D, Doshi Dep. at 162:13–164:5). Regarding eligibility and conditions to receive benefits, it states:

**ELIGIBLE EMPLOYEES**

You are an eligible employee if you work in the United States, you are regularly scheduled to work at least 20 hours per week and you have been notified in writing by your management that you are covered by this Plan. If you are represented by a union, you are eligible only if your collective bargaining agreement provides for participation in this plan. The fact that you received this document does not necessarily mean that you are eligible; you must also have received a cover memo, signed by a Vice President of Human Resources (or his/her designee), with this document addressed to you individually by name.

In addition to the above rules regarding eligibility, the following employees are specifically <u>excluded</u> from participating in this Plan:

- Employees of the Technical Services Sector who are classified by the Company as being in the following employment categories:

    - Service Contract Act (SCA) employees
    - Union Represented employees

**CONDITIONS FOR RECEIVING BENEFITS**

In order to receive the benefits of this Plan, you must meet all the following conditions:

- You must be designated as eligible for this plan by a Vice President of Human Resources (or his/her designee). You are designated if you received a memo addressed to you, notifying you of your eligibility for this benefit.

- You must remain employed in your current position until you are laid off by your management. You must actually be laid off by the Company. If, before your layoff date, you voluntarily quit, retire, are terminated for cause, or transfer to another position within the Company, you will not receive benefits under this Plan.

- You must sign a Confidential Separation Agreement and General Release that will include, among other things, a release of any and all claims that you may have against the Company.

The following conditions also apply if your job moves, or your business unit is sold:

- If your current job moves more than 50 miles from your current work location, and you elect to terminate your employment instead of relocating, your termination will be treated as a layoff.

- If your business unit is sold and you are not offered similar employment with the buyer at the time of the closing of the sale, you may terminate employment as a layoff within 30 days of the closing date. For purposes of this Plan, "similar employment" means any job that pays at a base salary of at least 85% of your pre-sale base salary; it does not include overtime or bonus opportunities, fringe benefits, or other aspects of employment.

(Ex. D-20, Doshi Dep. Ex. 20, at NGC01344). On the preceding page, it also states: "Note: An appendix to the plan contains specific information about the cash portion of the benefit that you are eligible to receive and may contain additional conditions for receiving benefits. Your Human Resources department upon request will provide you with a copy of the Appendix." (*Id.* at NGC01343 (emphasis added)). The Appendix applicable to Technical Services provides additional conditions for receiving benefits as follows:

9

**Additional Conditions for Receiving Benefits:** In addition to the conditions for receiving benefits specified in the body of the Summary Plan Description, the following additional conditions must be satisfied:

- An employee whose layoff is due to a contract termination and who has not been offered a position with comparable responsibilities and pay rate (within 10% of the employee's hourly Northrop Grumman rate), as determined by the Technical Services Vice President of Human Resources (or his/her designee) in his/her discretion, with a successor contractor or subcontractor (i.e., "incumbent transfer" scenarios).

  - If the employee is offered such a position and comparable pay rate (within 10% of the employee's hourly Northrop Grumman rate), the employee will not be eligible for severance.
  - If the employee is offered such a position and comparable pay rate (within 10% of the employee's hourly Northrop Grumman rate) and declines, the employee will not be eligible for severance.

(Ex. D-19, Doshi Dep. Ex. 19, at NGC14563; Ex. D, Doshi Dep. at 151:25–153:20). The appendix then provides a table listing the number of weeks of cash severance for a given number of years of service. (Ex. D-19, Doshi Dep. Ex. 19, at NGC14563).

### Severance Eligibility Determinations Prior to October 2011

11.     Within any given sector, the sector's management, or strategic leadership team, would determine whether its sector was going to offer severance, and typically it was based on groups. (Ex. A, Penkert Dep. at 49:5–14; Ex. E, Gilmore Dep. at 43:2–16, 45:2–10). In the Technical Services Sector, this decision was based on whether the program or contract on which employees worked priced that program or contract with the Federal Government to account for paying severance to employees. (Ex. E-3, Gilmore Dep. Ex. 3, at NGC13454 (referring to programs bidding severance); Ex. E, Gilmore Dep. at 100:13–101:12).

12.     Technical Services was formed by transferring workgroups that been in other sectors to the Technical Services sector. When a program (i.e., workgroup) was transferred to Technical Services from another sector, the employees in that program/workgroup were supposed to retain the level of severance benefits it had prior to moving into Technical Services.

10

(Ex. G-14, Ussery Dep. Ex. 14, at NGC13928; Ex. G, Ussery Dep. at 176:3–17; Ex. A, Penkert Dep. at 54:16–19, 82:11–84:4).

13.     When Northrop transferred the QRC program (the group for which Plaintiffs Carlson and DeLuca worked) into the Technical Services Sector in 2006 or 2007, Northrop Grumman promised the employees they would retain the same benefits they had in the Electronic Systems (ES) Sector.  (Ex. F, DeLuca Dep. at 8:12–9:18).

14.     Prior to October 2011, within the Technical Services Sector, the various severance schedules showing which programs offered severance and how much appeared in the Workplace Relations Sharecenter.  (Ex. H-6, Pierce Dep. Ex. 6, at NGC01815; Ex. H, Pierce Dep. at 47:17–51:10).  Mike Penkert confirmed that prior to October 2011, with respect to a particular group of employees within Technical Services being eligible for severance or not, the human resources team would need to understand the legacy benefits for that group and administer it accordingly.  (Ex. A, Penkert Dep. at 84:5–23).

15.     Prior to October 2011, everybody in the company who met the eligibility criteria in the Severance Plan got a memo of eligibility when laid off.  (Ex. A, Penkert Dep. at 41:16–53:10). In the other three Sectors, the Aerospsace Systems (AS) Sector, Electronics Systems (ES) Sector, and Information Systems (IS) Sectors (ES and IS combined to form MS-Mission Systems), all employees who met the eligibility criteria were given severance, before and after October 2011. (*Id.* at 49:5–14, 51:19–53:10).

**Severance Eligibility Coordination with Benefits Administration and Internal Documentation of Severance Eligibility Based on Benefit Program Codes**

16.     The Northrop Grumman Benefits Administration Department managed continuation of the health benefits under the severance plan. This Department received notification from a sector's management and human resources team which group of employees

were eligible, and based on that information, it would notify the outside administrator the

employees in those groups were potentially eligible for severance.  (Ex. B, Sholinsky Dep. at

45:14–25).  The Vice Presidents of Human Resources for the given sector would communicate

which groups of employees were and were not eligible for severance.  (*Id.* at 49:12–50:12).

17.     The Benefit Program Code ("BPC") was a three-letter code that indicates, among

other things, whether or not the employee is eligible for severance.  (Ex. B-14, Sholinsky Dep.

Ex. 14, at NGC25081 ("Eligibility for severance is generally based on BPC."); Ex. B, Sholinsky

Dep. at 102:4–8, 133:16–136:5).  The BPC was used for many benefits at Northrop Grumman,

not just severance, as explained by Kathleen Sholinsky:

> It indicated which of the various plans you were eligible for; for example, in the
> savings plan which subgroup which said how much of an employer match you
> would get, whether you were eligible to participate in the program or not.  For
> health and welfare, it basically told us what cost share you got, so how much the
> employee paid for medical.  It told us which suite of benefits you could get
> because in this time period not everyone was eligible for the same benefits.  So
> some people got the legal plan, some people didn't.  Some groups got FSAs, some
> didn't.  Some had severance, some didn't.  So that's how we determined what
> benefits to offer you.

(Ex. B, Sholinsky Dep. at 100:19–101:11).

18.     Every employee in the HR database is assigned a Benefit Program Code.  (Ex. A,

Penkert Dep. at 173:18–20, 177:12–14).  It can be changed or reassigned.  (*Id.* at 176:19–25).  The

assigned BPC is a function of the sector, division, program, and sometimes even based on the

contract the employee works on.  (*Id.* at 177:12–23).

19.     Between 2009 and 2017, Benefits Administration would send a list of benefit

program codes to the sectors and ask for confirmation that the groups of employees were

correctly coded as severance eligible for not.  (Ex. B, Sholinsky Dep at 81:20–82:18).  Benefits

Administration did this as a measure to confirm and update with people in the applicable sector

which programs were severance eligible on roughly an annual basis. (*Id.* at 169:2–25). Also, whenever a sector made a change to which groups of employees were severance eligible, the sector would confirm with Benefits Administration so it could update the Benefit Program Codes. (*Id.* at 85:17–87:17).

20. Technical Services made those selections to its Benefit Program Coding of its employees for year 2012. (Ex. I-8, Fonseca Dep. Ex. 8, at NGC1586; Ex. I, Fonseca Dep. at 44:2–72:13). On June 25, 2012, Cindy Fonseca emailed Louise Ussery (the Vice President of Human Resources for Technical Services Sector), titled "Severance & Medical Coverage," and stated:

> I spoke with Cindy C. and she indicated that Hewitt does program the medical coverage extension based on severance plans selected. For employees with severance who are also on the [Northrop Grumman Health Plan], they receive the following: 'If you qualify for benefits under this Plan, you will receive an extension of your medical, dental, and vision benefits at active rates, for a period equal to one week for each Year of Service, up to a maximum of 26 weeks.'
>
> …
>
> If we make a change to the extension of benefits, we will need to notify Hewitt so they can initiate programming changes. Enclosed are the programming selections for the benefits that went into effect January 1, 2012.

(Ex. I-8, Fonseca Dep. Ex. 8 at NGC1586). Cindy Fonseca explained Technical Services "have their own offering due to the Service Contract Act employees and unions within that sector." (Ex. I, Fonseca Dep. at 44:19–21).

21. On April 6, 2016, Kathleen Sholinsky emailed Kristen Elliott in Technical Services asking which of the BPCs on a list was eligible for the corporate severance plan benefits. (Ex. B-18, Sholinsky Dep. Ex. 18, at NGC25135; Ex. B, Sholinsky Dep. at 165:12–168:7). Kristen Elliott responded on April 11, 2016, attaching an updated excel spreadsheet showing which BPCs were eligible for severance. (Ex. B-18, Sholinsky Dep. Ex. 18, at

13

NGC25135–36). The spreadsheet Elliott attached lists group names, whether that group is union or service contract act, its three-letter BPC, the effective date of the BPC, and its original date. (*Id.* at NGC25136).

22. The Benefit Program Codes appear in a spreadsheet maintained by Benefits Administration that list groups of employees eligible for the same benefits by column, and the rows showing the various benefits and finally the BPC and cost group. (Ex. B, Sholinsky Dep. at 156:11–157:7; Ex. B-17, Sholinsky Dep. Ex. 17, at NGC25134.00001–03). Technical services had three different BPC codes, appearing in columns "R" through "U" of the spreadsheet. (Ex. B, Sholinsky Dep. at 160:1–162:2; Ex. B-17, Sholinsky Dep. Ex. 17, at NGC25134.00002). The difference between TS employees in columns R and S is those in column S, whose BPC indicated they are not severance eligible, were employees specifically excluded in the summary plan description (e.g., Service Contract Act employees or collectively bargained employees). (Ex. B, Sholinsky Dep. at 160:7–24). Across columns, in the row that is populated with "Corporate" or "None", anybody in the group coded as "Corporate" would have been coded for the employee to receive severance in the event of layoff. (*Id.* at 163:24–164:5).

23. The eligibility needed to be determined in advance of the layoff whether the pool of individuals was severance eligible so that when a layoff of severance eligible employees occurred, and the layoff termination code was entered, they were already coded as being eligible so that the health plan administrator would know to continue benefits. (Ex. B, Sholinsky Dep. at 52:15–23; Ex. A, Penkert Dep. at 36:10–37:25). This determination was made at the beginning of a program or contract. (Ex. B, Sholinsky Dep. at 53:20–54:13).

24. The continuation of medical, dental, and vision insurance benefits portion of the severance plan was activated based on a termination code entered indicating layoff. (Ex. B-9,

Sholinsky Dep. Ex. 9, at NGC07002; Ex. B, Sholinsky Dep. at 89:19–92:19).  Sholinsky wrote to

Cindy Collins on November 23, 2011:

> The benefits portion of the severance plan is administered by Hewitt based on the receipt of a termination code = to layoff or retirement in lieu of layoff and whether the employee is in a BPC that has been defined as eligible for severance. As a practical matter, there is no other way to administer the Plan since the letters issued by the HR VP or whether the release has been signed by the employee are not provided to Hewitt (or Benefits Administration). Therefore, unless we are specifically told otherwise, the assumption is that a laid-off employee in an eligible BPC is receiving severance. If, for some reason the employee is not eligible, then HR is supposed to advise Benefits Administration so that we can take action with Hewitt.
>
> To my personal knowledge*, the plan has been administered like this for at least 10 years.*
>
> If there are groups within specific BPCs that are not eligible for severance (or other benefits) then we need a way to identify based on the data that is sent to Aon Hewitt. The cleanest way is a separate BPC but we could consider using the SCA indicator if it is reliable.

(Ex. B-9, Sholinsky Dep. Ex. 9, at NGC07002) (emphasis added).

25.     The termination code would indicate whether it was a layoff or a retirement in

lieu of layoff, and if the laid-off employee were in a group designated as severance eligible by

Benefit Program Code, the laid-off employee would receive continued health benefits under the

severance plan, regardless of whether the business unit chose to give the employee a memo of

eligibility after the layoff.  (Ex. B, Sholinsky Dep. at 89:4–92:24).

26.     Even though the plan's eligibility criteria for both forms of severance were the

same, benefits administration applied this as the benefit program code governing eligibility, and

if the employee were laid off, he or she would receive the health benefit component of severance,

for the BPC already took into account the group works over 20 hours per week, works in the

United States, etc.  (Ex. B, Sholinsky Dep. at 95:13–98:6).

27.     Benefits Administration received no information about whether or not somebody received a memo of eligibility signed by a Vice President of Human Resources, and Benefits Administration would have to specifically be told otherwise to not continue health benefits pursuant to the severance plan for an employee with a BPC code indicating he or she was eligible for severance in the event of layoff.  (Ex. B-9, Sholinsky Dep. Ex. 9, at NGC07002; Ex. B, Sholinsky Dep. at 103:25–104:12; Ex. B-2, Sholinsky Dep. Ex. 2, at NGC01026).

28.     Northrop Grumman also uses the Benefit Program Code to determine who to report as "participants" on the Form 5500s.  (Ex. A, Penkert Dep. at 38:24–40:1, 169:24–188:9). The source of data to calculate the number of participants in the plan comes from the HR database.  (*Id.* at 172:3–173:4).  "The BPC code would show whether or not an employee is eligible for benefits, and then by extension, also benefits continuation under the severance plan." (*Id.* at 173:1–4).

29.     The list of BPC codes, the number of employees in them, and whether that code is severance eligible, for year 2012 appears at Michael Penkert's deposition Exhibit 9.  (Ex. A-9, Penkert Dep. Ex. 9; Ex. A, Penkert Dep. at 180:2–8).  If an employee was listed with a BPC as Severance or PJS in exhibit A-9, that employee would be included as a participant on the Form 5500. (Ex. A, Penkert Dep. at 186:1–5).  The 2012 Form 5500 reported 67,269 participants at the beginning of the plan year and 61,967 at the end of the plan year.  (Ex. A-11, Penkert Dep. Ex. 11, boxes 5–6; Ex. A, Penkert Dep. at 185:4–186:5).  That data to calculate the total number of participants was based on data about participants who were coded with the BPC codes in Penkert exhibit 9.  (Ex. A, Penkert Dep. at 186:17–23).

**October 2011 Technical Services Adds a "Tap on the Shoulder" Management Decision
They Feel Like Paying the Severance at Time of Layoff Before a VP of Human Resources
May Deliver the Memo of Eligibility Without Stating that Condition in the Plan**

30.     The CEO of Northrop Grumman, Wesley Bush, had a desire for cross-sector

collaboration, for the sectors to be able to work together, share talent, and move talent between

sectors.  (Ex. I, Fonseca Dep. at 151:4–18).  Variation in whether certain programs provided

severance or not could make cross-sector collaboration more difficult.  (Ex. I-12, Fonseca Dep.

Ex. 12, at NGC24979; Ex. I, Fonseca Dep. at 151:19–152:19). In mid-2011, Technical Services

was under an ongoing effort to communize fringes, retirement benefits, and severance.  (Ex. E-3,

Gilmore Dep. Ex. 3, at NGC13454 ("With its ongoing effort to communize fringes and

retirement benefits, the team also looked at standardizing the severance schedule across the

sector."); Ex. E, Gilmore Dep. at 97:5–98:23).

31.     Sometime in 2011, Human Resources professionals within the Technical Services

Sector compiled a list of programs that were severance eligible.  (Ex. H, Pierce Dep. at 30:8–17,

31:12–32:11).

32.     On June 28, 2011, Lucy Mineghino (Technical Services Director of

Compensation) emailed Louise Ussery and Demile Gilmore, among others within Technical

Services, and attached a "Technical Services Program Severance Authorization Form."  (Ex. E-2,

Gilmore Dep. Ex. 2, at NGC14043–44; Ex. E, Gilmore Dep. at 64:7–65:25). She stated:

> For your review and input, I have attached a Program Severance Form which
> would be used to designate which programs will be eligible for severance. . . . Per
> our discussion, it was decided that the HR director is responsible for making sure
> that there is consistency in a program for employee severance.  All employees on
> a program or none should receive severance (unless there is a change in
> circumstance. Change would require special approval).

(Ex. E-2, Gilmore Dep. Ex. 2, at NGC14043).  The attached Program Severance Authorization

Form for Technical Services had fields to fill in for RIF (i.e., Reduction in Force) date or

approximate RIF date, plus management approvals.  (Ex. E-2, Gilmore Dep. Ex. 2, at NGC14044).

33.  On July 6, 2011, Louise Ussery emailed various Technical Services professionals, attaching the program authorization form and a memo regarding standardization of the severance schedule across the Technical Services Sector effective October 2011.  (Ex. E-3, Gilmore Dep. Ex. 3, at NGC13452–55).  The memo attached to the email communicated from the Vice President of Human Resources of Technical Services to other Technical Services HR and management:

> *Background*: TS follows the Corporate Severance Plan. The severance plan has two different schedules providing different levels of benefits. Different programs have elected to bid either the high or the low schedule or no severance. With its ongoing effort to communize fringes and retirement benefits, the team also looked at standardizing the severance schedule across the sector. As a result of this analysis, TS will move to the high severance schedule sector-wide.
>
> *Severence Eligibility*: Severance does not have to be provided on a program. Employees are only eligible to receive severance if they receive a memo from the HR&A VP (or designee) at the time of layoff telling them that they are eligible for severance.

(Ex. E-3, Gilmore Dep. Ex. 3, at NGC13454 (underlined emphasis added)).  The memo from the VP of Human Resources remained listed in the 2012 Plan as a "Condition for Receiving Benefits" after the criteria under "Eligible Employees," though.  (*Supra* ¶¶ 4, 8; Ex. A-5, Penkert Dep. Ex. 5, at NGC03491; Ex. A-3, Penkert Dep. Ex. 3, at NGC06972).  The memo also states the HR director is responsible for maintaining a list of programs on which laid-off employees have received severance and a list of programs on which laid-off employees have not received severance.  (Ex. E-3, Gilmore Dep. Ex. 3, at NGC13454).  The accompanying Program Severance Authorization form deleted the field from the prior version to include the "RIF Date or Approximate RIF Date."  (*Compare* Ex. E-3, Gilmore Dep. Ex. 3, at NGC13455 *with* Ex. E-2, Gilmore Dep. Ex. 2, at NGC14044, *supra* ¶ 33).

34.     On October 4, 2011, Cat Turner emailed all Human Resources Directors, Human

Resources Managers, and Human Resources Business Partners within Technical Services

regarding Technical Services adopting a uniform cash severance schedule, attaching that

schedule and Reduction in Force guidelines.  (Ex. H-6, Pierce Dep. Ex. 6, at NGC01815–25; Ex.

H, Pierce Dep. at 47:17–51:10).  Ms. Turner stated

> With the consolidation of the heritage severance schedules to one uniform
> schedule effective October 1, 2011, the RIF guidelines located on the Workplace
> Relations Sharecenter have been updated to reflect that one schedule is now
> recognized.  The new severance schedule is now located in the WPR sharecenter,
> and all historical schedules have been removed.  As a reminder, *severance
> eligibility is on a program to program basis and HR Directors are responsible for
> maintaining a division-specific listing of severance eligible programs.*

(Ex. H-6, Pierce Dep. Ex. 6, at NGC01815) (emphasis added).  The accompanying Severance

Plan Appendix provided a maximum amount of cash severance at 26 weeks of pay.  (*Id.* at

NGC01817).  The attached TS Sector RIF Guidelines states under a heading regarding Severance

Eligible Employees: "If Employees selected and approved for a RIF are eligible for severance,

the HRBP [Human Resources Business Partner] should prepare paperwork.  Eligibility for

severance is on a program to program basis.  Questions of eligibility should be directed to the

HR Director."  (*Id.* at NGC01823).

35.     Starting in October 2011, the Technical Services Sector, after adopting a uniform

schedule of cash severance benefits, began requiring management approval to pay severance at

the time of laying off an employee or a group of employees through use of the Program

Severance Authorization Form.  (Ex. A, Penkert Dep. at 71:12–72:16; Ex. E, Gilmore Dep. at

48:9–50:20).  In Technical Services, this created an added level of approval in order to pay

benefits. (Ex. E, Gilmore Dep. at 49:3–14).

> [E]very time a decision was made or an action was taken around a layoff, would –
> their division GM would have to generate that – let's see, it was the severance
> plan authorization form. And then that would be reviewed and then a

determination was made for, however that group was defined, whether or not that group was going to get severance benefits.

(Ex. A, Penkert Dep.at 72:8–16).

36.    Sholinsky testified that Technical Services "did a revamp of their benefits… [at] the end of 2011. They set—they set up new eligibility groups within the sector. And my best recollection is that we did set up separate benefit program codes for the [Service Contract Act] employees at that point."  (Ex. B, Sholinsky Dep. at 107:12–18). Technical Services updated its list of which groups were severance eligible by BPC for Benefits Administration for year 2012, as well.  (*Supra* ¶ 20).

37.    Sholinsky worked with a group of people who updated the Severance Plan Summary Plan Description for 2012.  (Ex. B-10, Sholinsky Dep. Ex. 10, at NGC25122; Ex. B, Sholinsky Dep. at 109:11–113:17;).  They expanded the definition of ineligible employees, made a few other cleanups, and posted it on Benefits On Line ("BOL").  (Ex. B, Sholinsky Dep. at 110:6–12).  The people excluded from eligibility in Technical Services (e.g., union represented employees and service contract act workers) in the 2012 Summary Plan Description were coded to be excluded from severance by the BPC so they would not receive the continued health benefits portion of severance in the event of layoff.  (*Id.* at 94:13–95:6).

38.    After the Technical Services sector adopted a single higher severance schedule sector-wide starting October 2011, Demile Gilmore explained:

ILMD [division] was going towards no severance across the board . . .the high plan was across the board . . . And because of that, right, the – you know, in the environment too, we had sequestration going on, just uncertainty of business, so generally the thought was put more money into winning business and not providing severance.

(Ex. E, Gilmore Dep. at 54:23–55:13).  That decision was based on affordability due to the government's inability to pass a budget, so the division was unable to know the funding level for

20

programs going forward, and concerned that a significant number of contracts could end or be significantly curtailed, and cause a large number of layoffs.  (Ex. E, Gilmore Dep. at 58:18–60:18, 118:19–119:8; Ex. I, Fonseca Dep. at 137:19–25). That decision was made by Christopher Jones, VP/GM of the ILMD division within Technical Services at the time, and Nimish Doshi, CFO of ILMD.  (Ex. E, Gilmore Dep. at 56:4–58:5).

39.    On Thursday May 12, 2012, Christopher Jones wrote the following regarding whether severance should be provided for a particular group: "Now is not the right time for severance, and I want to pump more money in business growth and program protect for the current employees."  (Ex. E-4, Gilmore Dep. Ex. 4, at NGC00984; Ex. E, Gilmore Dep. at 113:3–127:2).

40.    When there was a layoff within Technical Services, business managers wanted to know the monetary cost of paying the cash severance to the laid off employees before deciding if they would authorize the severance, even for those coded severance eligible by Benefit Program Code.  (Ex. H-27, Pierce Dep. Ex. 27, at NGC03048 ("They do want to know the cost of severance."); Ex. H-32, Pierce Dep. Ex. 32, at NGC24922–24 (discussing cost of severance and number of years of service); Ex. H-33, Pierce Dep. Ex. 33, at NGC24931 (calculating cost of severance for the layoff); Ex. H, Pierce Dep. at 135:19–138:11, 156:1–159:11).

41.    Regarding financial factors that went into considering whether severance would be paid within Technical Services, Michael Penkert testified:

> I do know that TS, especially when it was put together and even until today, runs on a very low margin, and so they watch very carefully each program, contract, division to make sure they are hitting their financials. So affordability has always been a key word used in TS. So it would have been for whatever the situation was at the time for the division to make whatever decision they needed to for severance and, actually, lots of different things that they would participate in with the company.

(Ex. A, Penkert Dep. at 200:20–201:5).

## Technical Services Encounters Problems Implementing "Tap on the Shoulder" Additional Level of Management Approval That Is Not Stated in the Plan

42.     On November 23, 2011, Kathleen Sholinsky, Corporate Manager of Health &

Welfare Administration, wrote:

> The benefits portion of the severance plan is administered by Hewitt based on the receipt of a termination code = to layoff or retirement in lieu of layoff and whether the employee is in a BPC that has been defined as eligible for severance. As a practical matter, there is no other way to administer the Plan since the letters issued by the HR VP or whether the release has been signed by the employee are not provided to Hewitt (or Benefits Administration). Therefore, unless we are specifically told otherwise, the assumption is that a laid-off employee in an eligible BPC is receiving severance. If, for some reason the employee is not eligible, then HR is supposed to advise Benefits Administration so that we can take action with Hewitt.

> To my personal knowledge, the plan has been administered like this for at least 10 years.

(Ex. B-9, Sholinsky Dep. Ex. 9, at NGC07002; Ex. B, Sholinsky Dep. at 98:12–109:5). Cindy

Collins forwarded that email to others and stated "The 'tap on the shoulder' severance eligibility

may be legal but we need to figure out how to manage it with Hewitt." (Ex. B-9, Sholinsky Dep.

Ex. 9, at NGC07002). Lucy Mineghino forwarded that message to Louise Ussery, Vice

President of Human Resources for Technical Services Sector, and stated "FYI—seems the

programmers programmed everyone in a BPC that indicates severance, to receive severance

benefits from Hewitt whether or not they were 'tapped' on the shoulder and given a severance

letter." (*Id.*).

43.     On June 25, 2012, Cindy Fonseca emailed Louise Ussery (the Vice President of

Human Resources for Technical Services Sector), titled "Severance & Medical Coverage," and

stated:

> I spoke with Cindy C. and she indicated that Hewitt does program the medical coverage extension based on severance plans selected. For employees with

> severance who are also on the [Northrop Grumman Health Plan], they receive the following: 'If you qualify for benefits under this Plan, you will receive an extension of your medical, dental, and vision benefits at active rates, for a period equal to <u>one week for each Year of Service</u>, up to a maximum of 26 weeks.'
>
> …
>
> If we make a change to the extension of benefits, we will need to notify Hewitt so they can initiate programming changes. <u>Enclosed are the programming selections for the benefits that went into effect January 1, 2012</u>.

(Ex. I-8, Fonseca Dep. Ex. 8, at NGC1586 (emphases added); Ex. I, Fonseca Dep. at 44:2–72:13;). The attached spreadsheet showed only one group that was neither Union nor Service Contract Act that was coded as not eligible for severance. (Ex. I-8, Fonseca Dep. Ex. 8, at NGC01588, line 17). Regarding that document, when asked if employees in the same BPC are supposed to receive the same severance benefits, Fonseca responded "that benefit program code didn't necessarily identify whether somebody got a cash severance benefit." (Ex. I, Fonseca Dep. at 56:18–57:17).

44. On July 2, 2012, Cindy Fonseca (Director of Compensation and Benefits for Technical Services) emailed Louse Ussery advising she had a call with Chris McGee (Vice President of Compensation and Benefits for Northrop Grumman, not a specific sector, Ex. I, Fonseca Dep., at 65:6–7)) regarding severance benefits in Technical Services. (Ex. I-12, Fonseca Dep. Ex. 12, at NGC24978–79; Ex. I, Fonseca Dep. at 135:4–22;). Cindy Fonseca described her conversation as: "They definitely do not want several one-off schedules popping up due to sequestration . . . he's concerned we will end up being the sector no one wants to work for (because of the reduced benefit's), especially in light of Wes' desire for cross-sector collaboration (makes transferring employee's to TS more challenging/less desirable when they lose benefits)." (Ex. I-12, Fonseca Dep. Ex. 12, at NGC24979). Louise Ussery responded that day stating

> This is not good news, as for our SCA etc it is unaffordable, but again we cannot make these decisions without CFO and bus mgrs.. We may want to add another briefing to our SCA benefits briefing, so we can get a reaction from our leadership.
>
> We also need to understand cost ramifications.
>
> Seriously, this could be a "go out of business" scenario. Thanks.

(Ex. I-12, Fonseca Dep. Ex. 12, at NGC24978).  The Service Contract Act employees, however, were already excluded from eligibility in the 2012 Summary Plan Description. (*Supra* ¶ 8; Ex. A-3, Penkert Dep. Ex. 3, at NGC06972).

45.    On July 11, 2012, Cindy Fonseca emailed Louise Ussery, subject titled "Severance," and stated

> Sounds like the fringe costs are done by eligibility category (Shared Services, Sustainment & Modernization, etc.) . . .I thought that anyone in the RAP benefit code was eligible for severance. Can Chris make that decision that anyone supporting ILMD (regardless of benefit code) is now ineligible for severance? Or is that the process for the 'tap' approach on severance notification?

(Ex. I-9, Fonseca Dep. Ex. 9, at NGC24987; Ex. I, Fonseca Dep. at 72:19–73:6).

46.    On July 24, 2012, when Peter DeLuca's correspondence regarding lack of severance was forwarded to Denise Peppard (the Chief Human Resources Officer, and person identified in the Plan as the Administrator), Ms. Peppard asked Louise Ussery, the VP of Human Resources for Technical Services, "Can we discuss?  No severance?"  (Ex. G-4, Ussery Dep. Ex. 4, at NGC06997; Ex. G, Ussery Dep. at 69:8–70:7).

47.    Also on July 24, 2012, before responding to Denise Peppard, Louise Ussery corresponded with Demile Gilmore (the Director of Human Resources for the ILMD division within Technical Services) regarding the lack of severance for the QRC program layoffs.  (Ex. G-3, Ussery Dep. Ex. 3, at NGC02843–45; Ex. G, Ussery Dep. at 47:23–48:20).  Ms. Gilmore explained that program had a layoff in March 2011 and provided severance, but the current

layoff from the same program did not pay severance, and the lack of severance was a surprise.

(Ex. G-3, Ussery Dep. Ex. 3, at NGC02843). Ms. Ussery responded "Why did they decide not

severance a year later? This could be a problem." (*Id.*). Gilmore responded:

> *The new severance plan went into effect in October.* At that time, the decision
> was to continue severance only for programs that were in the middle to a lay-off
> and had started severance. But all new lay-offs had to get approval. The no
> severance unless program received approval was for all RIFs going forward.

(*Id.*) (emphasis added).

48.     After consulting with colleagues, Louise Ussery responded to Denise Peppard:

> This is something that has been standard for TS and part of the business model
> prior to the creation of the Sector, 2 weeks' notice (unless WARN) in most cases
> no severance. For the majority of our contracts severance has not been priced or
> reimbursable by the Customer. In the rare case that severance is part of the
> contract it is granted, and distributed to all on the program consistently.
>
> …
>
> This particular individual is in the ILMD division, under Chris Jones. For the
> most part, employees within TS understand the lack of severance, due to the
> "badge swap" history, a loss of employment meant they would be employed by
> new incumbent . . . This is one of the reasons TS was looking for a middle of the
> road severance option, as the Corporate plan (almost a week per year with a cap)
> is unaffordable.

(Ex. G-4, Ussery Dep. Ex. 4, at NGC06996). Ussery explained in her deposition that her basis

for representing employees understand the lack of severance was that "[t]he history of the

technical services is that they are low cost contracts and not highly skilled employees. They were

a lot of SCAs, Service Contract Act employees" that would usually get hired by the next

contractor who took over the contract. (Ex. G, Ussery Dep. at 77:18–78:8).

49.     Ussery did not mention to Denise Peppard in that email that Service Contract

Employees were already expressly excluded from eligibility as part of revisions to the 2012

Summary Plan Description. (Ex. G-4, Ussery Dep. Ex. 4, at NGC06996–97; *see also supra* ¶ 8;

Ex. A-3, Penkert Dep. Ex. 3, at NGC06972). Ussery received an email from Fonseca just two

weeks earlier reiterating those Service Contract Act employees were "ineligible to be covered by our NG Severance Plan" and they could not be covered without drafting a new Plan. (Ex. I-13, Fonseca Dep. Ex. 13, at NGC2610; Ex. I, Fonseca Dep. at 174:5–12). Ussery forwarded her response to Denise Peppard to Cindy Fonseca and stated: "As you know, this has been our model and it comes down to affordability."  (Ex. G-4, Ussery Dep. Ex. 4, at NGC06996).

50.     On July 25, 2012, Louise Ussery (Vice President of Human Resources for Technical Services) forwarded the above email exchange to Cat Turner stating "For tomorrow, but I need to understand who approves severance or no severance.  Apparently they did not give it to this group, and they are complaining so I expect open lines." (Ex. G-5, Ussery Dep. Ex. 5, at NGC02743; Ex. G, Ussery Dep. at 89:4–90:12).

51.     On July 25, 2012, Keri Pierce communicated to two people there is no policy on who gets severance. (Exs. H-25 & H-26, Pierce Dep. Exs. 25–26). She wrote to Larry Wingate "There isn't a documented severance policy.  There is a summary plan description of what someone gets if they receive severance, *but no policy on who gets it and who does not*." (Ex. H-25, Pierce Dep. Ex. 25, at NGC03052; Ex. H, Pierce Dep at 129:7–21) (emphasis added).  She also exchanged messages with Michael Bentley, where he communicated he had been asked "Does NG have a severance/RIF policy", to which Pierce responded "there is not a severance policy, there is a severance plan description that is used when it is determined that a program will provide a severance package".  (Ex. H-26, Pierce Dep. Ex. 26, at NGC03557; Ex. H, Pierce Dep. at 132:25–133:7).

52.     On July 26, 2012, Alan Carlson emailed the Vice President and General Manager responsible for his division at the time (ILMD), Christopher Jones, and inquired why there had been no communication about any changes to severance policy, and communicated he would

have made different employment decisions had he known about a change to severance.  (Ex. G-8, Ussery Dep. Ex. 8, at NGC14066–67; Ex. G, Ussery Dep. at 106:16–107:10).

53.    In early August 2012, Alan Carlson emailed Denise Peppard, Chief Human Resources Officer at Northrop Grumman, and asked what changed regarding severance because the program on which he worked paid people severance in April 2011.  (Ex. G-8, Ussery Dep. Ex. 8, at NGC14061–62).  Ms. Peppard forwarded his email to Louise Ussery, the Vice President of Human Resources for Technical Services Sector, and asked "Is the statement about severance being offered on the same program accurate?"  (*Id.* at NGC14061).

54.    Kimberly Miller, Louise Ussery, and Demile Gilmore corresponded with each other to formulate a response and Kimberly Miller asked "Did we take them off of severance but they we[re] first on the high severance plan? The language I underlined confused me as it appears they went to the 'high severance plan' in October 2011 but then did we take them off of the high plan[?]  If so what date did we eliminate the severance plan[?]"  (Ex. G-7, Ussery Dep. Ex. 7, at NGC14059; Ex. G, Ussery Dep. at 94:16–95:10).

55.    On August 27, 2012 Cat Turner and Keri Pierce exchanged messages regarding whether notice had been given to employees on programs that previously paid severance to laid off employees:

> **Turner, Cat (TS) [9:44 AM]:**
> btw—you guys have never given any of your programs that were severance eligible and then decided they were not eligible any written notice have you? that they wouldn't be eligible in the future?
> **Pierce, Keri G (TS) [9:45 AM]:**
> no we haven't
> i know that was the big issue that came up in louise's staff meeting last week
> **Turner, Cat (TS) [9:49 AM]:**
> that's what I told Doreen—that I had been told that since it was erisa governed that we had to provide notice that the 'benefit' was going away
> she says she thought that the HRD's were communicating it
> …and that lucy told them to

27

but I know how lucy and the HRD's and Doreen all work

(Ex. H-34, Pierce Dep. Ex. 34, at NGC12910; Ex. H, Pierce Dep. at 159:12–22).

56.     Referring to the time period between 2011 and 2014, Michael Penkert testified

there was no communication to TS employees about no one getting severance unless

management approved at the time of layoff. (Ex. A, Penkert Dep. at 198:9–22).

57.     On October 2, 2012, regarding severance for an employee named Willie Robinson

within Technical Services, David Field wrote to Larry Wingate "Nimish just told me per

Corporate policy, we have to pay severance."  (Ex. H-36, Pierce Dep. Ex. 36, at NGC13515; Ex.

H, Pierce Dep. at 170:1–7).  Larry Wingate forwarded to Keri Pierce: "Unbelievable …"  (Ex. H-

36, Pierce Dep. Ex. 36, at NGC13515).  Keri Pierce responded: "When did this happen?  It

seems that we should have been told this.  I also wonder does that mean we will be going back

and paying all those employees we have laid off this year?  I just sent Demile an email."  (*Id.*).

58.     On December 5, 2012, Cindy Fonseca emailed Louise Ussery regarding a

severance briefing to take place the following day, and attached a power point presentation and

an excel spreadsheet.  (Exs. I-15, I-16, I-17, Fonseca Dep. Exs. 15–17; Ex. I, Fonseca Dep. at

208:4–21, 209:23–210:13, 235:23–236:6).  The second page of the presentation states:

- TS currently utilizes two approaches with the severance plan for their non-VP population:

  1. Standard plan with a maximum payout of 26 weeks based on years of service

  2. No plan (zero weeks) — typically used for incumbent transfer type work with SCA contracts

- Severance is determined by contract based on affordability and government reimbursable (ie, incumbent transfers)

(Ex. I-16, Fonseca Dep. Ex. 16, at NGC14311).  The next page provides two tables, breaking

down for each division of Technical Services the number of programs that had severance cost

recoverable through the fringe rate, not recoverable, partially recoverable, and "N/A" (because the program is not eligible for severance). (*Id.* at NGC14312). The adjacent table broke down the divisions of Technical Services by the number of programs they had that were or were not severance eligible. (*Id.* at NGC14312). For division DGSD, the number in the "N/A" column (per footnote 2, program not eligible for severance) in table one equals the number of programs that are listed as not eligible for severance in table two: 35 programs. (*Id.*). For Division TSD, the number of programs listed in the "N/A" column in table one equals the same number listed as not eligible for severance in table two: 6 programs. (*Id.*). But for the ILMD Division, every program was listed as having recoverable severance in table one, rather than in the "N/A" column, and all were listed in the adjacent column as not eligible for severance. (*Id.*). The following table gives similar details but for each program. (Ex. I-17, Fonseca Dep. Ex. 17).

59.     On January 4, 2013, Kathleen Sholinsky responded to an email from Judy Ward (redacted by Defendants) in regards the Severance Plan Summary Plan Description, and stated:

> It is my understanding that TS Sector is possibly excluding more employees from Severance than the represented and SCA. I mention this as someone reading the language may come to the conclusion that the rest of TS Sector is eligible. I believe that we have had a couple of claims from TS employees that did not receive severance benefits.

(Ex. B-12, Sholinsky Dep. Ex. 12, at NGC12422; Sholinsky Dep. at 128:13–130:19). In her deposition, she explained the email:

> Yeah, my concern would be that if we specifically excluded some groups, the assumption would be that everyone else was included and then someone would have assumed that they could be eligible for severance if they were laid off. So that would be my concern. I just wanted to make sure that we addressed it, and that our legal, internal or external legal counsel, was fine with what was there.

(Ex. B, Sholinsky Dep. at 130:10–19).

60.     On October 9, 2013, Bill Drake emailed Aon Hewitt regarding changes made to the benefits administration and coding in Northrop's PeopleSoft system, copying Sholinsky.

(Ex. B-14, Sholinsky Dep. Ex. 14, NGC25079–83; Sholinsky Dep. at 133:16–141:24). One of the change orders made was for Aon Hewitt to update the Termination Code "LX", which would be used as a separation code for an employee in a severance-eligible BPC who is not to receive severance due to not getting the memo from a VP of Human Resources, does not work to the last day, or does not execute a release agreement. (Ex. B-14, Sholinsky Dep. Ex. 14, at NGC25081; Ex. B, Sholinsky Dep. at 93:5–95:12). Her change order stated: "In order to receive severance, the employee must be part of a formal process and sign a severance agreement." (Ex. B-14, Sholinsky Dep. Ex. 14, at NGC25081). She explained that the formal process to which she referred is the process at the business unit level of giving the employee the letter and having the employee sign the severance agreement. (Ex. B, Sholinsky Dep. at 137:1–21). She testified this "LX" code would only be used for severance-eligible persons who never received a memo or did not sign the severance agreement. (Ex. B, Sholinsky Dep. at 138:21–139:18).

61.     Though Sholinsky requested that "LX" separation code be implemented in December 2013, it did not become effective until some later time she could not recall. (Ex. B, Sholinsky Dep. at 139:19–141:4). She would not know if it had been used unless someone called it to her attention. (*Id.* at 141:5–24). Michael Penkert testified "that code is put in place and available now, but to date, the company has not used that new separation code . . . The new code that was put in place in 2013, honestly, the HR community is probably not even aware of that." (Ex. A, Penkert Dep. at 100:9–17).

62.     Prior to 2013, Sholinsky can recall nobody ever advising Benefits Administration not to follow the BPC code for the health benefit portion of severance. (Ex. B, Sholinsky Dep. at 104:13–105:10).

**2014—Technical Services Lowers the Cash Severance Schedule Sector-Wide and Resumes Delivering Memos to Laid-Off Employees in Programs Designated Severance Eligible**

63.     On January 9, 2014, Cindy Fonseca gave a PowerPoint presentation titled "TS Severance Update" that was a briefing for recommendations for the Technical Services Sector Severance benefits. (Ex. I-10, Fonseca Dep. Ex. 10, at NGC14550–56; Ex. I, Fonseca Dep. at 100:12–20).  The briefing provided that when Technical Services implemented the severance schedule sector-wide, harmonizing a variety of schedules within the sector, Service Contract Act and Union employees were excluded.  (Ex. I-10, Fonseca Dep. Ex. 10, at NGC14551).  She explained that since October 2011, divisions/programs would decide if they would use severance, and that was "typically not communicated to employees."  (*Id.*).  The slide regarding the 2014 modifications and changes states all employees are eligible except Service Contract Act employees and Union employees, and the schedule would be capped at 10 weeks of cash severance for exempt and non-exempt employees.  (*Id.* at NGC14552).

64.     On January 23, 2014, the Technical Services Sector issued its "Now in the News" correspondence to all Technical Services employees.  (Ex. A-19, Penkert Dep. Ex. 19, at 14354–56; Ex. A, Penkert Dep. at 197:15–23).  It states:

> Effective February 1, new changes to the Severance Plan for eligible U.S. based Technical Services employees will apply.  While we will continue to provide severance benefits under the Northrop Grumman Severance Plan for eligible employees who receive a cover memo signed by a Vice President of Human Resources (or his/her designee), we are modifying the severance schedule and adding an additional condition of receiving benefits. All divisions and functions within Technical Services will utilize the approved Technical Services Severance Schedules, which are contained in the Plan Appendix and will be provided by Human Resources upon request at TSHRSharedServ@ngc.com.

(Ex. A-19, Penkert Dep. Ex. 19, at NGC14355).

65.     On January 23, 2014, Cindy Fonseca emailed many individuals within the Technical Services Sector, attaching the new schedules of cash severance benefits to be used in

Technical Services. (Ex. J-14, Turner Dep. Ex. 14, at NGC04257–62; Ex. J, Turner Dep. at 206:21–207:20). She states:

> Also attached is a process that I covered with the HRIS team for how to respond to the email requests and ensure employees are receiving the correct copy of the schedule that applies to them (if any … i.e., SCA and Union employees should not get a copy). The manager email was released yesterday and as of right now there were 15 email requests from managers requesting copies of the schedules. The communication in Now in the News is scheduled to be released at 3 p.m. today so we suspect we'll get several more requests.

(Ex. J-14, Turner Dep. Ex. 14, at NGC04257). Ms. Fonseca also drafted suggested responses to emails from "**eligible**" employees (*id.* at NGC04261 (emphasis in original)) and responses to emails from Service Contract Act or Union Employees. (*Id.* at NGC04262). That document provided no guidance on who is "eligible" aside from not being a Service Contract Act or Union employee. (*Id.* at NGC04261–62).

66.     On January 23, 2014, Cindy Fonseca emailed Cat Turner final copies of the release agreement and appendices specifying the amount of cash severance benefit to use for layoffs of severance eligible individuals within the Technical Services Sector. (Ex. J-5, Turner Dep. Ex. 5, at NGC04996–5027; Ex. J, Turner Dep. at 92:16–93:23). The cover email stated "We can discuss tomorrow to ensure everyone understands why there are two and the importance of using the correct one based on the health plan participation." (Ex. J-5, Turner Dep. Ex. 5, at NGC04996).

67.     On February 1, 2014, Technical Services Sector began using the modified cash severance schedule to reduce the amount of cash severance a laid off employee can receive, capped at 10 weeks of pay if the non-director employee has over 20 years of service. (Ex. B-16, Sholinsky Dep. Ex. 16 at NGC01867; Ex. B, Sholinsky Dep. at 149:14–151:15). Only the cash severance schedule changed, but the duration of continuation of health benefits under the severance plan remained the same as before. (Ex. B, Sholinsky Dep. at 150:19–20).

68. After Technical Services lowered the schedule (i.e. the amount) of cash severance benefits, all the employees in Technical Services who met the eligibility requirements in the Plan received severance. (Ex. A, Penkert Dep. at 53:18–54:6). This is in line with every other Sector of the Company. (*Id.* at 43:15–46:12, 51:19–52:2, 43:15–46:12, 50:8–12).

### Claims for Benefits and Appeals

69. Plaintiffs' employment with Northrop Grumman terminated August 2012. (Dkt. #62, Am. Compl., ¶ 18; Dkt. #129, Answer, ¶ 18). Neither received a memo notifying them they were eligible for severance from a VP of human resources or that person's designee. (Dkt. #62, Am. Compl., ¶ 19; Dkt. #129, Answer, ¶ 19). They did, however, receive the continued medical, dental, and vision portion of severance based on their years of service, as laid out in the Severance Plan. (Dkt. #62, Am. Compl., ¶ 4; Dkt. #129, Answer, ¶ 4; Ex. F, DeLuca Dep. at 43:16–44:7; Ex. K, Carlson Dep. at 67:24–68:3, 70:15–71:15, 77:3–78:9).

70. Plaintiffs initiated claims for severance. (Ex. C-10, Collins Dep. Ex. 10, at NGC00404; Ex. C-11, Collins Dep. Ex. 11, at NGC00369–89; Ex. C, Collins Dep. at 99:4–16, 103:8–18).

71. In considering Carlson and DeLuca's claims, Margaret Collins received an email from Demile Gilmore, dated September 21, 2012, explaining why Plaintiffs Carlson and DeLuca were not given a memo from a Vice President of Human Resources. (Ex. C-17, Collins Dep. Ex. 17, at NGC00504–05; Ex. C, Collins Dep. at 134:12–22). Despite the program paying severance in prior layoffs, following October 2011, laid-off employees on such program would not get severance unless management decided to pay severance at the time of layoff, and the new contract had lower funding. (Ex. C-17, Collins Dep. Ex. 17, at NGC00504). Collins explained

this meant because the new contract had less funding than the expiring contract, there was no

money for severance. (Ex. C, Collins Dep. at 136:4–137:19).

72.     In considering those claims, Margaret Collins obtained advice from Northrop's

outside counsel that explained:

> I've removed the language regarding TS harmonizing severance, etc., because,
> under the plain terms of the Plan, the relevant eligibility requirement to receive
> benefits is that the individual have received the memo from VP of HR notifying
> him or her of eligibility for benefits. The underlying rationale at the sector level
> from giving or not giving someone a memo doesn't come into play under the
> terms of the Plan—the discretion is exercised by the VP of HR (or his or her
> designee) when deciding whether to give a terminated employee the memo. I
> realize . . . it would be easier for us and for the claimant if there were very
> specific and rigid eligibility provisions that could be pointed to. However, that is
> simply not how the Plan is designed. The Plan really gives the Company
> discretion on a case by case basis.

(Ex. C-18, Collins Dep. Ex. 18; Ex. C, Collins Dep. at 139:9–144:8; *see also* Dkt. #1-6)). The

revisions also eliminated the acknowledgment the same program paid severance in March 2011.

(Ex. C-18, Collins Dep. Ex. 18).

73.     Defendants denied their claims for cash severance benefits on November 9, 2012.

(Ex. C-20, Collins Dep. Ex. 20, at NGC00452–55; Ex. C-21, Collins Dep. Ex. 21, at

NGC00764–67; Ex. C, Collins Dep. at 151:11–152:20; Dkt. #62, Am. Compl., ¶ 53 & Ex. 3

thereto; Dkt. #129, Answer, ¶ 53)).  Both letters explained the basis of the denial as follows:

> As provided under the "Conditions for Receiving Benefits" section on page 3 of
> the summary plan description (copy enclosed), an employee must receive a memo
> from a Vice President of Human Resources (or his or her designee) notifying the
> employee that he is eligible for benefits under the Plan. We verified with
> Technical Services management that Mr. [De Luca / Carlson] did not receive such
> a memo and that Technical Services management did not intend for Mr. [De Luca
> / Carlson] to receive such a memo. Therefore, under the terms of the Plan, Mr.
> [De Luca / Carlson] is not eligible for benefits under the Plan.

(Ex. C-20, Collins Dep. Ex. 20, at NGC00454; Ex. C-21, Collins Dep. Ex. 21, at NGC00766).

74.     On November 16, 2012, Margaret Collins emailed Cat Turner in response to a request for the Severance Plan Guide to Administration, saying: "I checked our files and am not aware of an Admin Guide dated July 1, 2003. Can you share that with me? I'm sure it is no longer valid but would like to have a copy for our files. Thanks." (Ex. J-11, Turner Dep. Ex. 11, at NGC03475; Ex. J, Turner Dep. at 175:25–177:2). Cat Turner responded on November 19, 2012—10 days after Northrop had already denied Plaintiffs' claims—and attached a copy of the Guide to Administration, stating: "I was actually looking for the administrators guide—you may not have gotten the attachment I had to the original email since I sent this to Julie. I've attached the 2003 admin guide that I have. Do you know if there is a more current version of this for HR, who administers the severance plans?" (Ex. J-11, Turner Dep. Ex. 11, at NGC03475). The Guide to Administration Turner sent Collins appears at NGC03477–86.

75.     Plaintiffs timely appealed the denials. (Dkt. #62, Am. Compl., ¶ 54; Dkt. #129, Answer, ¶ 54). Margaret Collins prepared a packet of materials for the Severance Plan Review Committee to consider in determining Carlson's appeal, dated January 31, 2013. (Ex. C-23, Collins Dep. Ex. 23, at NGC24210–58; Ex. C, Collins Dep. at 165:17–166:4). She prepared a similar packet for the Severance Plan Review Committee to consider in determining DeLuca's appeal dated January 31, 2013. (Ex. C-24, Collins Dep. Ex. 24, at NGC24367–75, NGC24327–66; Ex. C, Collins Dep. at 162:22–166:7). Both sets of information consisted of the plaintiffs' claims, claim denials, appeals, and summary plan description documents, with a summary by Ms. Collins. (Ex. C-23, Collins Dep. Ex. 23, at NGC24212; Ex. C-24, Collins Dep. Ex. 24, at NGC24369). Margaret Collins advised the Committee:

> The Plan <u>does not</u> require that the Company establish a policy, whether written or unwritten, with regard to the determination of whether a terminated employee will receive a memorandum and thus be eligible for benefits under the Plan. In accordance with the Plan terms, discretion as to that determination is exercised by

the Vice President of Human Resources (or that individual's designee) on a case by case basis.  A determination with respect to an employee may be based on the particular circumstances surrounding the individual's termination of employment or, as was the case here, on more broadly based, contract-driven factors.

…

The Plan design clearly permits the exercise of discretion on an employee-by-employee basis. The Committee is not charged with the task of determining the reason why the employee did not receive a memorandum.

(Ex. C-23, Collins Dep. Ex. 23, at NGC24211; Ex. C-24, Collins Dep. Ex. 24, at NGC24368). Her preparation for the committee did not include the Guide to Administration she received from Cat Turner 10 days after denying Plaintiffs' claims (*supra* ¶ 74), and included no explanation of the designations of eligible employees through the BPCs that lead to continuation of health benefits under the Plan.  (Exs. C-23 & C-24, Collins Dep. Exs. 23–24, *passim*).

76.    Collins testified she was unaware of the purpose of the memo prior to October 2011 because she was not administering the plan.  (Ex. C, Collins Dep. at 194:17–24).  She was unaware of any criteria the VP of Human Resources should apply in determining whether to deliver the memo of eligibility, and unaware of anything that could be an improper reason to withhold a memo of eligibility.  (*Id.* at 145:1–146:3).  She explained it did not matter why an employee did not receive a memo from a Vice President of Human Resources at layoff, and that it would not have mattered if the decision to withhold the memo was based on a roll of dice.  (*Id.* at 183:25–186:9).

Q. So if they had rolled the dice to determine whether or not particular employees were going to receive severance, that would not have mattered to your determination?

A. I would not have known that.

Q. And even if you knew it, it wouldn't have mattered; is that—

A. It would not have mattered.  I would have administered according to the terms of the plan.

36

(*Id.* at 184:24–185:9).

77.    The Severance Plan Review Committee convened on January 31, 2013 to consider Carlson and DeLuca's appeals. (Ex. C-27, Collins Dep. Ex. 27, at NGC24376; Ex. C, Collins Dep. at 214:8–215:10). On February 1, 2013, the Severance Plan Review Committee upheld the denials of severance to Carlson and DeLuca. (Ex. C-28, Collins Dep. Ex. 28, at NGC003692; Ex. C-29, Collins Dep. Ex. 29, at NGC00228; Ex. C, Collins Dep. at 231:10–232:11). Collins authored the letter to Carlson on behalf of the committee and wrote:

> As provided under the "Conditions for Receiving Benefits" section on page 3 of the summary plan description (a copy was previously provided to you), in order to be eligible for benefits under the Plan, an employee must, among other requirements receive a memo from a Vice President of Human Resources (or his or her designee) notifying the employee that he is eligible for benefits under the Plan . . . Therefore, under the terms of the Plan, you are not eligible for benefits under the Plan. The Plan terms clearly require that the employee receive a memo from a Vice President of Human Resources (or his or her designee) notifying the employee of his eligibility for benefits <u>and do not restrict the Vice President's (or designee's) discretion with regard to the criteria applied to determine whether a laid-off employee will receive benefits under the Plan</u>.

(Ex. C-28, Collins Dep. Ex. 28, at NGC00362 (emphasis added)). The identical language is used in the letter to DeLuca, except for referring to the different recipient of the letter. (Ex. C-29, Collins Dep. Ex. 29, at NGC00228). The record does not reflect the Committee considered the Guide to Administration or the role of Benefit Program Codes. (Exs. C-23, C-24, C-27, C-28, C-29, Collins Dep. Exs. 23–24, 27–29, *passim*).

## Defendants' Affirmative Defenses

78.    The Plan contains the following clause regarding filing legal actions for benefits:

> You must pursue all claims procedures described in this document before you seek any other legal recourse with respect to Plan benefits. In addition, any lawsuit must be filed within six months from the date of your denied appeal, or two years from your termination date, whichever occurs first.

(Ex. A-3, Penkert Dep. Ex. 3, at NGC06978).

79.     Regarding its Eighth Affirmative Defense (statute of limitations), Defendants

were asked the following Interrogatory and gave the following Answer:

**INTERROGATORY NO. 23:**

With respect to your Eighth Affirmative Defense (statute of limitations),
set forth Your basis for this defense by explaining (a) which of Plaintiffs' claims
You contend are barred by the applicable statute of limitations as untimely, (b) as
to each such claim that You contend is so barred, the statute of limitations that
You contend applies, (c) when the statute of limitations began to run and when it
expired, and the basis for Your contention, (d) which Class Members' or group of
Class Members' claims are barred by the statute of limitations (as You contend)
and (e) whether You contend that this defense applies to Plaintiffs' individuals
claims.

**RESPONSE:**

In addition to its General Objections, Northrop objects to this
Interrogatory and its subparts as failing to comply with Fed. R. Civ. P. 33(a), as
Plaintiffs have exceeded the limit of written interrogatories allowed under Rule
33(a). Further, to the extent that Plaintiffs refuse to respond to Defendants'
Interrogatories on the ground that contention interrogatories are premature at this
time, Defendants also object to this Interrogatory on that basis. Northrop further
objects to subpart (d) of this Interrogatory as premature based on the fact that a
class has not been certified.

Subject to and consistent with its General and Specific Objections,
Northrop states that Plaintiffs have alleged a nation and company-wide putative
class action made up of certain former employees of Northrop whose employment
was terminated back to 2012. Plaintiffs' claim that Defendants breached their
fiduciary duty and violated ERISA § 510. The putative class members claims will
differ as to the particular limitations period and date of accrual to which they are
subject, and in some cases, the filing of the First Amended Complaint will likely
not have been timely. Hence, certain putative class members claims may be time-
barred. Northrop currently is not aware of any evidence suggesting that Plaintiffs'
individual claims were untimely.

(Ex. L, Response No. 23, Defendants' Amended Responses to Plaintiffs' Fourth and Fifth

Set of Interrogatories Directed to All Defendants).

Dated: July 3, 2020                     Respectfully submitted,


                                        /s/ Michael Bartolic
                                        Michael Bartolic
                                        The Law Offices of Michael Bartolic, LLC
                                        208 S. LaSalle Street, Suite 1420
                                        Chicago, Illinois 60603
                                        Tel: 312-635-1600
                                        Email: mbartolic@michaelbartolic.com

                                        R. Joseph Barton
                                        Block & Leviton LLP
                                        1735 20th Street, NW
                                        Washington, DC 20009
                                        Tel: 202-734-7046
                                        Email: jbarton@blockesq.com

                                        Vincent Cheng
                                        Block & Leviton LLP
                                        100 Pine Street, Suite 1250
                                        San Francisco, CA 94111
                                        Tel: 510-543-0489
                                        Email: vincent@blockesq.com

                                        *Attorneys for Plaintiffs*


## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served upon all parties of record via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois on July 3, 2020.

                                        /s/ Michael Bartolic
                                        Michael Bartolic